196 Cal.App.3d 34 (1987)
241 Cal. Rptr. 539
HARRY L. FOWLER, Plaintiff and Appellant,
v.
VARIAN ASSOCIATES, INC., Defendant and Respondent.
Docket No. H002087.
Court of Appeals of California, Sixth District.
November 9, 1987.
*36 COUNSEL
Michael J. Korda and Clark & Korda for Plaintiff and Appellant.
Gilmore F. Diekmann, Jr., Dennis G. McCarthy and Bronson, Bronson & McKinnon for Defendant and Respondent.
OPINION
BRAUER, J.
Appellant Harry L. Fowler, plaintiff below, sued his former employer, respondent Varian Associates, Inc. (Varian) for wrongful termination, breach of contract, and intentional infliction of emotional distress. *37 The superior court granted Varian's motion for summary judgment on each of Fowler's causes of action. Fowler appeals from the judgment of dismissal. We affirm.

STANDARD OF REVIEW
(1) Summary judgment is properly granted only when the evidence in support of the motion establishes that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law. (Isaacs v. Huntington Memorial Hospital (1985) 38 Cal.3d 112, 134 [211 Cal. Rptr. 356, 695 P.2d 653]; Code Civ. Proc., § 437c, subd. (c).) Since a motion for summary judgment raises only questions of law regarding the construction and effect of the supporting and opposing papers, the appellate court independently reviews all of the papers, including the evidence presented in connection with the motion. (AARTS Productions, Inc. v. Crocker National Bank (1986) 179 Cal. App.3d 1061, 1064 [225 Cal. Rptr. 203].) Doubts as to the propriety of summary judgment are resolved against granting the motion. (Becker v. IRM Corp. (1985) 38 Cal.3d 454, 458 [213 Cal. Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601]; Rowland v. Christian (1968) 69 Cal.2d 108, 111 [70 Cal. Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].)

FACTS
The following uncontradicted facts are drawn from the declarations, deposition testimony, and evidentiary documents submitted in connection with the motion.
Fowler became marketing manager of Varian's solid state division pursuant to a written contract on May 11, 1981. Fowler had worked for Varian earlier, between 1950 and 1958.
At the time Varian rehired Fowler, his supervisor was James Johnson. Johnson left Varian in December 1983. About that time, Fowler and Johnson briefly discussed the possibility that Johnson would form his own company and that Fowler would join. Fowler did not think that anything would come of the discussion. Sometime later, however, Johnson informed Fowler that there would be a new company and asked whether Fowler was interested. Fowler told Johnson that "if the conditions were optimal, [he] would consider a job with [the new] company." Fowler was particularly concerned about whether the new company would be able to provide adequate insurance benefits.
After this second contact, Fowler became involved with Johnson's efforts to establish a new company. Although some of the details of Fowler's *38 involvement are disputed, the following facts are not. Fowler offered Johnson "ideas" and "suggestions" on "[b]usiness in general." Fowler and Johnson discussed the new business's capital structure. Both men anticipated that Fowler would be one of three owners of the business in equal shares, together with Johnson and David LaCombe, a former consultant to Varian.[1] Fowler characterized his involvement at this stage as that of a "potential partner in this enterprise," with the term "partner" "loosely defined." Fowler and Johnson intended the new company's product to be an amplifier designed especially for the military market. Fowler acknowledged that the product would be "a reasonable or viable alternative" to Varian's products and competitive with Varian's products "in the broadest sense." Varian and the new business would share "an identical group of customers."
Fowler's name for the new business was Omega. Alpha Industries, Inc., a direct competitor of Varian, became interested in investing in Omega. Fowler attended two meetings with Johnson, LaCombe, and representatives of Alpha. In opposing summary judgment, Fowler generally characterized his role at the meetings as that of a "passive participant"; in his deposition testimony, Fowler provided more detail. The major purpose of Fowler's presence at the meetings was to give the potential investors some assurance that he would be willing to join the enterprise. This is clear from Fowler's own deposition testimony that: "[t]he one question that I was there to answer was if all my demands could be met, would I consider being a part of it and my answer was, `Yes.'" At the meetings, Fowler also discussed "mechanical concepts."[2]
Sometime in June 1984 Varian learned that Fowler was involved with Omega through a telephone call from Andrew Kariotis, an officer of Alpha, who had attended Omega's presentation and decided to invest. Varian reacted. On June 20, 1984, Bruce Swartz, a vice president of Varian and Fowler's supervisor, and Joseph Phair, Varian's corporate counsel, questioned Fowler at a meeting. Fowler acknowledged that Johnson had contacted him about Omega and that he would probably join if his compensation *39 requirements were met. Fowler denied, however, that he was already a part of Johnson's operation. Swartz and Phair asked for details about Johnson's enterprise, but Fowler declined to provide them on the ground that he had an obligation to Johnson.
At the meeting, Varian also asked Fowler to sign an addendum to a confidentiality agreement that he had signed at the time he was hired. The addendum identified several specific categories of information as confidential. Fowler refused to sign the agreement at that time and said that he wanted to discuss the matter with an attorney. Swartz and Phair told Fowler that, until he signed, he could not return to work except to pick up his mail.
Varian continued to pay Fowler's salary while he decided whether to sign the addendum. Fowler consulted with Johnson's attorneys, who advised Fowler not to sign the addendum because it could be prejudicial if he left Varian. Based on this advice, Fowler informed Varian that he would not sign.
Shortly after Fowler refused to sign the addendum, Varian filed a civil action against Johnson and Alpha for unfair competition based in part on claims of employee solicitation by Johnson. Johnson and Alpha filed cross-complaints. Fowler consulted with Johnson's and Alpha's attorneys in connection with the litigation.[3] While the litigation was pending, Phair wrote to Fowler that Varian still "consider[ed] [Fowler] to be a valuable employee and [was] anxious to reach a mutually acceptable solution to the current impasse." Phair also wrote that Fowler's refusal to sign the addendum raised questions concerning his intentions and made it "difficult, if not impossible," for Varian to return Fowler to his former position.
In August, Fowler informed Phair that he intended to return to work at Varian and had prepared his own version of the addendum. On August 22, Varian accepted Fowler's version. On August 24, Fowler met with Joseph Bradley, vice president of Varian's Electron Device Group, to discuss his return to work. During his absence, Fowler's duties had been performed by another employee, James Orr. At the meeting, Bradley informed Fowler that Varian was satisfied with Orr's performance and had decided to keep him in the position. However, Bradley offered Fowler two alternative positions with Varian, one in Los Angeles and one in Phoenix, Arizona. Fowler *40 declined these positions for family and geographical reasons. Varian responded that it would continue to look for another position for Fowler.
While Varian continued to pay Fowler's salary, Fowler began to look for positions with other employers. On October 4, Fowler accepted a position with Narda Microwave, a competitor of Varian. On the same day, Fowler's attorney wrote to Varian that Fowler had decided to "resign[]" from Varian and characterized the resignation as "a recognition of Varian's constructive termination."
Until Fowler submitted his resignation, he received full salary and benefits from Varian. No one at Varian ever asked Fowler to resign or set a deadline on how long Varian would continue to search for a new position for Fowler.[4]

DISCUSSION
Fowler raised many theories in opposing Varian's motion for summary judgment. Fowler's first theory is that Varian's conduct amounted to a constructive termination. This was the necessary point of departure for Fowler's civil action, since Varian never expressly terminated his employment. Since the written employment contract did not expressly require cause for termination, Fowler's second theory is that the contract implicitly required cause. The constructive termination was wrongful, Fowler argues, because it lacked good cause, amounted to a breach of the implied covenant of good faith, and contravened public policy. Finally, Fowler contends that Varian intentionally inflicted emotional distress.
Undisputed facts establish that Varian had good cause to discharge Fowler. We affirm on this ground. Thus, there is no need to consider whether Fowler was employed at will[5] or whether Varian's actions amounted to a constructive discharge.[6] (2) (See fn. 7.) Because Varian had good cause to discharge Fowler, the discharge by definition was not in bad faith.[7] Fowler's *41 other theories  violation of public policy and intentional infliction of emotional distress  completely lack supporting evidence. Thus, the superior court properly granted Varian's motion.

Good Cause for Discharge
(3a) Varian contends that Fowler's actions constituted a breach of the duty of loyalty and, thus, good cause for discharge. In opposition, Fowler contends that his involvement with Omega was simply a permissible effort to seek other employment. While California law does permit an employee to seek other employment and even to make some "preparations to compete" before resigning (Bancroft-Whitney Co. v. Glen (1966) 64 Cal.2d 327, 346 [49 Cal. Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795]), California law does not authorize an employee to transfer his loyalty to a competitor. During the term of employment, an employer is entitled to its employees' "undivided loyalty." (Sequoia Vacuum Systems v. Stransky (1964) 229 Cal. App.2d 281, 287 [40 Cal. Rptr. 203].) Because Fowler preferred Omega's interests to Varian's, Varian had good cause to discharge him.
Fowler's close involvement with Omega eventually created a serious conflict of interest. As Varian's marketing manager, Fowler was obliged to use his information about Omega's plans to further his employer's business. As a potential partner in Omega, Fowler considered it his duty to treat its plans confidentially. Fowler could not continue to serve two masters by postponing indefinitely the decision whether to join Omega. Since Varian specifically demanded information about Omega, Fowler could resolve the conflict only by complying with Varian's request or leaving the company.
Since Varian justifies its dismissal of Fowler on the ground of an asserted breach of the duty of loyalty, the question on appeal is whether the undisputed facts demonstrated a breach as a matter of law. Although the parties dispute some of the details of Fowler's involvement with Omega, sufficient facts remain undisputed to support the summary judgment.
Fowler had substantial information about Omega, Varian's potential competitor. According to Fowler's own declaration, he had several discussions with Johnson and LaCombe about the new enterprise. Fowler also read the business plan that Johnson prepared for presentation to Omega's potential investors. With Johnson, Fowler discussed the new enterprise's *42 capital structure and examined a possible building site. Fowler also attended and took part in discussions at two meetings with potential investors.
Through these activities Fowler had substantial information about a new company organized specifically for the purpose of competing with his employer. When asked by Varian about Omega's plans, however, Fowler refused to provide any such information on the ground that he owed an obligation to Johnson, Omega's principal. Fowler's response was fundamentally inconsistent with his duty of loyalty to Varian. As Varian's marketing manager, Fowler had an acknowledged obligation to share with his employer information about competitors' plans. In effect, Fowler disabled himself through his involvement with Omega from giving his undivided loyalty to Varian.
Our holding that Varian had good cause to discharge Fowler based upon a breach of the duty of loyalty is not in conflict with the decision in Bancroft-Whitney Co. v. Glen, supra, 64 Cal.2d 327, in which the Supreme Court stated that a corporation's president was entitled to make some preparations to compete with his employer. (Id. at p. 346.) In Bancroft-Whitney, the court held that the president's failure to disclose could create liability for damages only if the failure harmed the corporation. Because the corporation was in fact harmed by its president's failure to disclose that he had recruited subordinates for a competitor, the Supreme Court directed the trial court to enter judgment for the corporation and to retry the issue of damages only. The Bancroft-Whitney court did not purport to change in any way the longstanding rule that a breach of fiduciary duty constitutes good cause for discharge. Indeed, the court had no occasion to address the question, since the case did not present wrongful discharge issues.
Fowler also went beyond gathering information about Omega to assist it in obtaining financing. The apparent purpose of Fowler's attendance at the meetings was to assist Omega in obtaining financing by associating himself with the enterprise. Fowler testified that "[t]he one question that I was there to answer was if all my demands could be met, would I consider being a part of it and my answer was, `Yes.'" In other words, the potential investors were given reason to believe that the new enterprise might, under the right conditions, benefit from Fowler's experience as Varian's marketing manager. While it may be possible to argue about the degree to which Fowler's assistance helped Omega and hurt Varian, it would be absurd to argue that Fowler's participation at the meetings was consistent with his duty to prefer his employer's interests over those of its competitors.
(4) Fowler argues that the existence of "good cause" cannot be determined on a motion for summary judgment. Fowler's argument is not correct. *43 (See, e.g., Clutterham v. Coachmen Industries, Inc. (1985) 169 Cal. App.3d 1223, 1227 [215 Cal. Rptr. 795]; Crosier v. United Parcel Service, Inc. (1983) 150 Cal. App.3d 1132, 1140 [198 Cal. Rptr. 361].) Indeed, "[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer." (Labor Board v. Electrical Workers (1953) 346 U.S. 464, 472 [98 L.Ed. 195, 202, 74 S.Ct. 172].) Moreover, where "the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment." (Pugh v. See's Candies, Inc. (1981) 116 Cal. App.3d 311, 330 [171 Cal. Rptr. 917].) (3b) Varian had good cause for discharge based on either of two events: (1) Fowler's refusal to disclose his information about, or (2) his assistance in obtaining financing for, an enterprise organized to become Varian's direct competitor. Because Fowler did not present evidence to contradict these facts, the court properly granted Varian's motion for summary judgment.

Public Policy
(5) Fowler contends that his discharge constituted punishment for seeking other employment and, as such, violated public policy. We disagree both with Fowler's characterization of the facts and with his legal conclusion.
Fowler's argument derives, ultimately, from Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167 [164 Cal. Rptr. 839, 610 P.2d 1330], in which the Supreme Court established an exception to the general rule that an employer may discharge without cause an employee serving at the will of the employer. Under Tameny, the discharge of an employee at-will can still be actionable if it "clearly violate[s] an express statutory objective or undermine[s] a firmly established principle of public policy." (Id. at p. 172.) The discharge at issue in Tameny was motivated by an employee's refusal to participate in an illegal plan to fix retail gasoline prices, conduct which violated express provisions of federal and state antitrust law. (Id. at p. 170; see, e.g., 15 U.S.C.A. § 1 et seq. (Sherman Antitrust Act), Bus. & Prof. Code, § 16720 et seq. (Cartwright Act).)[8]
We state the obvious in observing that no "firmly established principle of public policy" (Tameny v. Atlantic Richfield Co., supra, at p. 172) authorizes an employee to assist his employer's competitors. Our holding that Varian had good cause to discharge Fowler is based on the undisputed *44 evidence that Fowler preferred the interests of his employer's competitor to those of his employer.
Fowler argues that Varian's conduct towards him violated a broad, free-competition policy set forth in Business and Professions Code section 16600. But section 16600 addresses narrower concerns. Section 16600 declares as "void" all contracts "by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind." (Bus. & Prof. Code, § 16600.) In its typical application, section 16600 invalidates certain far-reaching postemployment covenants not to compete. (See, e.g., Muggill v. Reuben H. Donnelly Corp. (1965) 62 Cal.2d 239, 242-243 [42 Cal. Rptr. 107, 398 P.2d 147, 18 A.L.R.3d 1241].) This case does not involve a covenant not to compete. Moreover, Fowler does not expressly argue that Varian's demand for an addendum to the confidentiality agreement violated section 16600. That argument would be unavailing in any event, since agreements designed to protect an employer's proprietary information do not violate section 16600. (Gordon v. Landau (1958) 49 Cal.2d 690, 694 [321 P.2d 456].)

Emotional Distress
(6a) In his complaint, Fowler based his emotional distress claim on Varian's "questioning [his] loyalty and integrity." In opposing Varian's motion, however, Fowler failed to demonstrate the existence of a triable issue of material fact relevant to the existence of outrageous conduct  an essential element of the cause of action.
(7) To be "outrageous," conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." (Davidson v. City of Westminster (1982) 32 Cal.3d 197, 209 [185 Cal. Rptr. 252, 649 P.2d 894].) Moreover, "`[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.'" (Fuentes v. Perez (1977) 66 Cal. App.3d 163, 172 [136 Cal. Rptr. 275], quoting from Rest.2d Torts, § 46, com. h, at p. 77; cf. Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 499 [86 Cal. Rptr. 88, 468 P.2d 216].)
(6b) No fact in the record would permit a finding that Varian's conduct was outrageous. In arguing to the contrary, Fowler relies primarily on Varian's demand for his signature on an addendum to the confidentiality agreement. Fowler's precise argument, however, is very hard to credit. The addendum began with the boilerplate phrase: "[i]n consideration of my continued employment by VARIAN...." Fowler testified in his deposition that he considered this phrase offensive. However, the confidentiality agreement *45 that Fowler had already signed, apparently without objection, began with nearly identical language. Varian's presentation of a contract containing boilerplate language taken from an existing contract between the same parties falls far short of outrageousness.
There is no evidence in the record suggesting that Varian or its personnel behaved outrageously towards Fowler at any time. With one exception, Fowler conceded that his contacts with Varian personnel "were conducted in a friendly, businesslike manner" and "were not insulting" to him. The one exception, in Fowler's opinion, was Joseph Phair, the attorney who demanded that Fowler sign the addendum to the confidentiality agreement. Fowler felt that Phair was "antagonistic" and that conversations with Phair were "upsetting" and "inflammatory." Fowler's subjective reaction to Phair's conduct, however, is not evidence that Phair's conduct was outrageous. Outrageousness is an objective standard applied to actual conduct.
The only evidence in the record about Phair's actual conduct does not raise a triable issue of fact. Fowler's declaration contains only a single statement relevant to a cause of action for infliction of emotional distress: Fowler declared, without purporting to quote any speaker exactly, that he was told in meetings he "was a disloyal employee."
The alleged accusations of disloyalty do not raise a triable issue of fact as to outrageousness for two reasons. First, the accusation was true; the term "disloyal" is an accurate legal characterization of Fowler's involvement with Omega. Second, the manner in which this true statement was made was not extreme or outrageous. The statement in Fowler's declaration appears to be, in part, Fowler's interpretation of Phair's demand for Fowler's signature on the addendum. As already discussed, however, the language of the addendum was not outrageous. Moreover, Phair's accompanying oral remarks to Fowler were pointed but not outrageous. According to Fowler's own deposition testimony, Phair asked Fowler two apparently rhetorical questions occasioned by Fowler's involvement with Omega: "[h]ow do you expect to go back to your position after what you have done," and "[h]ow could you expect people to do anything but be suspicious of you." However, Fowler did not recall that Phair insulted him or raised his voice. Thus, nothing in Phair's conduct can reasonably be described as "so extreme as to exceed all bounds of that usually tolerated in a civilized community." (Davidson v. City of Westminster, supra, 32 Cal.3d 197, 209.)
Because the evidence did not contain facts that would have justified a finding that Varian engaged in outrageous conduct, the superior court properly granted summary judgment as to this cause of action.

*46 DISPOSITION
The judgment is affirmed.
Agliano, P.J., and Capaccioli, J., concurred.
Appellant's petition for review by the Supreme Court was denied February 3, 1988.
NOTES
[1] In its brief, Varian states unequivocally but incorrectly that "[a]ppellant and Johnson discussed recruiting, and finally did recruit David LaCombe, a consultant in Varian's Solid State Microwave Division." In fact, the deposition testimony to which Varian refers does not suggest that Fowler had anything to do with recruiting LaCombe. The testimony reads as follows: "Q. Did you have any discussions with Mr. Johnson over this time frame about potential employees of your proposed enterprise? A. Yes. We had one very clear discussion. Q. What discussion did you have with him on that? A. The fact that there should be no effort made to requisition Varian employees." Thus, we do not base our decision on Varian's contention as to how LaCombe was recruited.
[2] Varian interprets Fowler's remark to mean that Fowler "presented the mechanical concept of Johnson's proposed product line." While Varian's interpretation may or may not be correct (and we thus do not accept it for purposes of reviewing the summary judgment), it is clear at least that Fowler was more than an observer.
[3] Varian asserts that Fowler offered to testify for Varian's adversaries in the unfair competition litigation. Apparently, Fowler offered to testify truthfully on some points that might have been harmful to Varian. Our decision does not assume or suggest in any way that truthful testimony as a percipient witness would have constituted a breach of the duty of loyalty.
[4] Fowler questions how actively Varian was searching for a new position in light of its doubts about his loyalty.
[5] Fowler, who in his managerial capacity hired subordinates, testified that it was Varian's policy not to discharge any employee without cause.
[6] We note that the written employment agreement expressly provided that Fowler was hired to serve as marketing manager of Varian's solid state division and not in any other capacity. Varian's decision not to allow Fowler to perform his duties would have to be evaluated in that light.
[7] Even if the employer merely has a good faith, reasonable belief in the existence of cause, regardless of whether cause actually exists, the implied covenant is not violated. (Koehrer v. Superior Court (1986) 181 Cal. App.3d 1155, 1171 [226 Cal. Rptr. 820].) Fowler argues that Varian lacked a good faith belief, but the record contains absolutely no supporting evidence. Nor does the record contain any evidence that Varian's decision to discharge Fowler was pretextual or motivated by anything other than his involvement with Omega. In his deposition, Fowler testified that he did not know of anyone at Varian who bore him personal animosity or ill will. Fowler's affidavit in opposition to the motion for summary judgment did not even address the subject of bad faith.
[8] Because we assume that Fowler was not employed at will, the Tameny court's holding is not clearly relevant. This is because the public policy doctrine that Tameny articulates merely limits an employer's right to discharge without cause an employee at will. (Tameny v. Atlantic Richfield Co., supra, 27 Cal.3d 167.)