Filed 6/20/24  Flanigan v. Rheumatology Diagnostics Laboratory CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| MATTHEW FLANIGAN, | B318831 c/w B320941 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC688804) |
| v. |  |
| RHEUMATOLOGY DIAGNOSTICS LABORATORY, INC., |  |
| Defendant and Appellant. |  |

APPEAL from a judgment and postjudgment order of the Superior Court of Los Angeles County, Terry A. Green, Judge. Reversed and remanded with directions.

Schlichter, Shonack & Keeton, Jamie L. Keeton and Joel L. Williams for Defendant and Appellant.

Law Offices of Edward Y. Lee and Edward Y. Lee for Plaintiff and Respondent.

_____

Plaintiff Matthew Flanigan (Flanigan) was employed as the director of IT for defendant Rheumatology Diagnostics Laboratory, Inc. (RDL). Shareholders (former RDL employees) brought a derivative action against RDL and its management. To investigate and defend against those claims, RDL's CEO and attorney spoke behind closed doors with Flanigan, who had previously reported what he believed to be illegal conduct by another RDL employee and who raised the issue again during the meeting. Flanigan then disclosed communications from this meeting to the plaintiffs in the shareholder action and their attorneys, and signed a declaration to support them in their derivative suit. Around the same time, Flanigan refused to sign a declaration (which contained information he believed to be false) to aid RDL's management in defending against the shareholder suit. RDL placed Flanigan on leave upon learning he had signed a declaration to support the derivative action, and ultimately terminated him.

Flanigan sued RDL for retaliation under Labor Code section 1102.5. The matter proceeded to trial by jury, and judgment was entered in Flanigan's favor. RDL appeals from that judgment arguing that Flanigan's retaliation claim fails as a matter of law.

Labor Code section 1102.5 prohibits employers from retaliating against employees for engaging in protected activities, such as reporting illegal conduct to an employee's superiors or refusing to participate in an illegal activity. (Lab. Code, § 1102.5, subds. (b), (c).) Subdivision (g) of the same section contains an important carveout: The section does not protect against "actions by employers against employees who violate[] the confidentiality of the [attorney]-client privilege [(Evid. Code, § 950 et seq.)]."

2

(Lab. Code, § 1102.5, subd. (g).) The attorney-client privilege, in turn, is subject to an exception—the crime-fraud exception (Evid. Code, § 956)—under which the privilege does not exist "if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." (*Ibid.*)

The attorney-client privilege (Evid. Code, § 950 et seq.) and the crime-fraud exception thereto (Evid. Code, § 956) typically arise in the context of discovery disputes (e.g., *BP Alaska Exploration, Inc. v. Superior Court* (1988) 199 Cal.App.3d 1240 (*BP Alaska*); *People v. Superior Court (Bauman & Rose)* (1995) 37 Cal.App.4th 1757 (*Bauman & Rose*); *State Farm Fire &Casualty Co. v. Superior Court* (1997) 54 Cal.App.4th 625 (*State Farm*); *Kerner v. Superior Court* (2012) 206 Cal.App.4th 84); no California court has examined either doctrine in the context of a claim for retaliation under Labor Code section 1102.5.

We are tasked with determining whether, in view of these statutes and the competing interests they further, Flanigan's lawsuit for retaliation (1) is barred under Labor Code section 1102.5, subdivision (g) because he disclosed RDL's attorney-client privileged communications to third parties, or (2) is not barred because, under the crime-fraud exception, RDL's request that Flanigan sign a declaration he believed to be false stripped the disclosed communications of any attorney-client privilege.

Applying the statutes involved, we conclude that the disclosed communications are not subject to crime-fraud exception, and that the employer's interest in terminating employment of those who violate the attorney-client privilege prevails under these circumstances. Because Flanigan disclosed RDL's privileged communications, he is not entitled to the protections afforded by Labor Code section 1102.5 (Lab. Code,

§ 1102.5, subd. (g)).  Accordingly, we reverse the judgment in Flanigan's favor and vacate his award of attorney fees.

### FACTS AND PROCEDURAL BACKGROUND

### I.    Pleadings

On January 5, 2018, Flanigan filed a complaint against RDL for violation of Labor Code section 1102.5, retaliation under California Fair Employment and Housing Act (FEHA), and wrongful termination in violation of public policy.

Flanigan's complaint alleges:  In April 2017, he discovered that RDL employee Kristine Azarraga (Azarraga) had plugged a thumb drive into the RDL network and imported copies of her former employer's standard operating procedures (SOPs) that included billing data, patient demographics, patient test results, and other proprietary information.  Flanigan believed that this conduct violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and reported it to RDL's senior management.

On August 15, 2017, former RDL employees Samuel Morris (Morris) and Richard Kazdan (Kazdan)—collectively, "shareholder plaintiffs"—filed a lawsuit against RDL's CEO Allan Metzger (Metzger), Azarraga, and a doctor employed by RDL (collectively, "derivative defendants") for breach of fiduciary duty based on mismanagement of the business and misappropriation of corporate assets.  RDL was named as a nominal defendant.

After being served with the complaint, derivative defendants sought Flanigan's assistance to prepare a false declaration to defend against the shareholder action.  Flanigan declined to perjure himself and instead signed a declaration to support shareholder plaintiffs in their ex parte motion—filed

4

August 29, 2017—to enjoin the alleged mismanagement by derivative defendants. Immediately after receiving the ex parte motion containing Flanigan's declaration, Metzger placed Flanigan on investigatory leave. Flanigan's employment was then terminated on September 12, 2017.

RDL terminated Flanigan for reporting Azarraga's HIPAA violation and/or for refusing to commit an illegal act (perjury).

## II. *Declarations*

### A. Declaration Flanigan Refused to Sign for Derivative Defendants

The declaration Flanigan refused to sign is exhibit one to his complaint. It is dated August 28, 2017, and states: "The complaint contains allegations related to RDL's protection[] of its trade secrets and intellectual property. It alleges . . . [Azarraga] 'unlawfully accessed, downloaded, and printed [RDL's] entire SOP library.' I am not aware of any evidence that would support this allegation. Similarly, the complaint alleges . . . [Azarraga] had used a thumb drive to upload SOPs from her previous employer into the RDL server.' I am not aware of evidence that would support that allegation either."

### B. Declaration Flanigan Signed to Support Shareholder Plaintiffs

Attached as exhibit two to Flanigan's complaint is the declaration he signed in support of the shareholder plaintiffs, also dated August 28, 2017. The declaration states that Flanigan notified RDL's senior management in April 2017 that Azarraga had used a thumb drive to view proprietary SOPs from her prior employer. The declaration also discloses communications between Flanigan, Metzger, and RDL's attorney at their August 18, 2017 meeting as follows: Metzger called Flanigan into

his office with Blank Rome attorney Jeffrey Richter (Richter) on the speaker phone.  Flanigan was asked to shut the door, and was informed of a cease-and-desist letter from shareholder plaintiffs addressed to Azarraga.  Metzger showed Flanigan an email containing various allegations against Metzger concerning mismanagement of RDL.  Richter and Metzger then asked Flanigan whether any rules were in place to prevent employees from accessing company data offsite, and whether shareholder plaintiffs had accessed data from offsite locations.

Flanigan's declaration further detailed Metzger and Richter's inquiry with Flanigan about whether the thumb drive Azarraga had plugged into RDL's network contained proprietary documents from her previous employer, to which Flanigan responded that he would double check.  Metzger and Richter asked Flangian not to put his findings in writing but instead to orally report to Metzger whether what he found was "good" or "bad."  After confirming his initial report, Flanigan told Metzger it was "bad."

## III.   *RDL's Motion for Summary Judgment*

RDL moved for summary judgment or, in the alternative, summary adjudication.[1]  The trial court granted the motion to summarily adjudicate the FEHA cause of action, but denied it with respect to the Labor Code section 1102.5 and termination in violation of public policy claims.

---

[1]      The briefing for this motion is not part of the record on appeal.

### IV. RDL's Request for Trial Court's Threshold Determination on Labor Code Section 1102.5, Subdivision (g)

On September 27, 2021, just before trial began, RDL informed the court, "as we were preparing to review jury instructions today, we came across a legal issue that may require the court make a ruling with respect to privilege before a jury is impaneled." RDL requested that the court make "a threshold determination of whether or not [Flanigan's] declaration [in support of the shareholders' action] was a disclosure of attorney-client communication," because, if so, Flanigan's lawsuit "is by definition excluded and 1102.5 cannot apply."[2]

The trial court responded that the issue could be raised in a motion for directed verdict "because first you have to lay a factual predicate," and "it's late in the day to do that." It continued, "[t]he only way to do it without having a jury trial would be to do a 402 hearing." The court then concluded, "the way to do this is to just have the trial, and then at the end of the trial if the evidence is without conflict that this was an attorney-client privileged communication . . . then it would be a directed verdict. I don't see it as being a pretrial motion."

### V. Trial

At trial, Metzger testified that he met with Flanigan and Richter on the phone to discuss the shareholder action against RDL. He also testified that he discussed a declaration Flanigan

---

[2] This argument had apparently not been briefed in connection with RDL's motion for summary judgment (filed by RDL's prior counsel), but the trial court "pointed out" at the hearing on that motion that Flanigan's declaration contained information ostensibly covered by the attorney-client privilege.

might sign to support derivative defendants in the shareholder action, and that Flanigan agreed to sign such declaration.

Flanigan testified that Metzger and Richter "didn't mention the declaration" at the mid-August meeting, and that Flanigan disclosed the attorney-client communications from that meeting to shareholder plaintiffs' attorney on August 23, 2017. Flanigan testified he received an email on August 28, 2017, from Jonathan Loeb (Loeb), the attorney representing derivative defendants in the shareholder suit, containing a declaration for Flanigan's review and signature and requesting that Flanigan respond with "any questions or comments" he might have. The subject line of that email read "privileged attorney-client communication." Flanigan did not agree with the statements in the proposed declaration and did not sign it. He then contacted Morris and informed him that Metzger and Loeb had asked him to sign a declaration. Flanigan then signed a declaration in support of shareholder plaintiffs.

## VI.    *Motion for Directed Verdict*

At the close of Flanigan's evidence, RDL moved for a directed verdict under subdivision (g) of Labor Code section 1102.5, which excludes from section 1102.5's protection employees who have disclosed their employer's privileged attorney-client communications. RDL's counsel argued that "Flanigan established without a doubt" that "the conversations outlined in his declaration that he signed on behalf of [shareholder plaintiffs] were privileged," and that "it's not appropriate for him now to claim . . . protections under 1102.5 when what he did was disclose attorney-client confidences."

The court responded to RDL's argument:  "Well, . . . that would be true if . . . that were the only fact.  But . . . it's a factual

8

question . . . regarding why he was fired . . . . Is it a disclosure of the attorney-client privilege? . . . I suppose there's an exception to attorney-client communications regarding committing a crime. And perjury would be a crime, so there may be an exception there."

Flanigan's counsel argued that "Evidence Code section 956[, subdivision] (a) states there's no . . . attorney-client privilege if the services of the lawyer were sought or obtained to enable or aid anyone to commit . . . or plan to commit a crime or a fraud." He continued to argue that Metzger "testified that . . . the declaration was completely contrary to what . . . Flangian discussed during th[e] meeting," yet that Metzger and RDL's attorneys "anticipated that he would sign that declaration."

After reading the parties' trial briefs on the crime-fraud exception, the court commented: "Well, this is pretty much an issue of first impression in California . . . ." Relying on *BP Alaska, supra,* 199 Cal.App.3d 1240, the court concluded that whether "the services of [RDL's] attorney were sought or obtained to enable or to aid anyone to commit or plan to commit a crime or fraud" is "a factual question" for the jury.

## V. *Jury Instructions and Verdict*

The jury instruction on Flanigan's Labor Code section 1102.5 claim read as follows: "To prove retaliation [Flanigan] must prove either prong A or prong B:

> A)      . . . RDL discharged him in retaliation for his disclosure of [Azarraga's] perceived HIPAA violation. In order to establish this claim, [Flanigan] must prove all of the following:
>
> 1. That RDL was [his] employer;

9

2. That [Flanigan] disclosed [Azarraga's] perceived HIPAA violation;

3. That [Flanigan] had reasonable cause to believe that the information disclosed noncompliance with federal law;

4. That RDL discharged [Flanigan];

5. That [Flanigan's] disclosure of information was a contributing factor in RDL's decision to discharge [Flanigan];

6. That [Flanigan] was harmed;

7. That RDL's conduct was a substantial factor in causing [Flanigan's] harm; and

8. **That the information disclosed by [Flanigan] in . . . his August 28, 2017 [d]eclaration signed in support of claims asserted against RDL by [shareholder plaintiffs] was not confidential[] attorney[-]client communications[] due to the [c]rime[-][f]raud exception] as defined below.**"
(Emphasis added.)

The jury was given a separate instruction on the crime-fraud exception.

The corresponding verdict form for prong A contained these elements and contained the only opportunity for the jury to make a finding on the crime-fraud exception. The verdict form for prong A read: "Did [Flanigan] disclose [Azarraga's] perceived HIPAA violation to a superior at RDL? . . . If your answer to Question 1 is yes, then answer Question 2. If you answered no, . . . proceed to Section B." The jury's answer to the first question

10

was "no." As a result, it made no express finding on the crime-fraud exception (question seven).[3]

The jury instruction for prong B concerned Flanigan's claim "that RDL discharged him in retaliation for his refusal to participate in an unlawful act," and contained eight elements analogous to the eight elements in prong A, including the applicability of the crime-fraud exception. The jury was given an instruction defining the crime of perjury.

In the verdict form, the jury responded "yes" to the question in prong B of whether RDL had presented Flanigan with a declaration to sign under penalty of perjury that it knew to be false and proceeded in answering the remaining questions. However, the question regarding the crime-fraud exception was omitted from the verdict form on this prong of Flanigan's retaliation claim, so the jury never made an express finding on the exception.

In the verdict form relating to Flanigan's claim for retaliation in violation of public policy, the jury was asked whether Flanigan "violate[d] his duties to RDL by sharing confidential and/or attorney client information to third parties adverse to RDL." The jury responded, "no."

The jury also found that "an officer, director, or managing agent of RDL" engaged in malicious, oppressive, or fraudulent conduct.

---

[3] The numbering and phrasing of the questions on the verdict forms differed from those on the jury instructions. Question seven of the verdict form read, "Did RDL knowingly and intentionally request Blank Rome to communicate with Matthew Flanigan to enable or aid in a plan RDL had to have Matthew Flanigan commit the crime of perjury[?]"

11

The jury returned a verdict in Flanigan's favor for a total of $1.68 million. Specifically, it awarded him $500,000 in past economic loss, $80,000 in future economic loss, and $500,000 in noneconomic damages. After a second phase of trial, the jury awarded Flanigan an additional $600,000 in punitive damages.

Judgment was entered on November 19, 2021.

## VI. *Posttrial Motions*

The parties stipulated to stay the enforcement of the judgment while RDL moved for a new trial and for judgment notwithstanding the verdict. The motions were made on various grounds, including that Flanigan's claim was barred under Labor Code section 1102.5, subdivision (g) because he violated the confidentiality of RDL's attorney-client privilege as a matter of law.

After full briefing and a hearing, the trial court denied RDL's posttrial motions. It reasoned: "I think that no matter what [Flanigan] did prior about disclosing attorney-client conversations, . . . there is a consequence for asking somebody to commit perjury and firing him because he didn't. I have a hard time believing [that] in this Labor Code . . . there is no consequence. The court of appeal will tell us . . . one way or another."

Flanigan moved for attorney fees. After full briefing and a hearing, the trial court awarded him fees in the amount of $769,365.

## VII. *Notice of Appeal*

RDL filed timely notices of appeal from the judgment and order awarding attorney fees, and the appeals were consolidated on RDL's motion.

12

### *DISCUSSION*

RDL asserts that the trial court erred in failing to conclude that Flanigan's claims were barred under Labor Code section 1102.5, subdivision (g) because the crime-fraud exception does not apply as a matter of law.[4]  Because this issue is dispositive, we do not reach RDL's remaining arguments.

### I.    *Pertinent Law*

#### A.    **At-will Employment and the Duty of Loyalty**

An employment may generally be "terminated at the will of either party on notice to the other." (Lab. Code, § 2922.) "During the term of employment, an employer is entitled to its employees' 'undivided loyalty.' " (*Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 41; see also *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 414.) "Indeed, '[t]here is no more elemental cause for discharge of an employee than disloyalty to his employer.' " (*Fowler*, at p. 43.) Particularly where the employee "occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment." (*Stokes v. Dole Nut Co.* (1995) 41 Cal.App.4th 285, 293.)

An agent such as an employee has the duty not to use or communicate confidential information of the principal or employer for a third party's purposes. (Rest.3d Agency, 8.05.) "An agent may . . . acquire confidential information about a principal or otherwise in the course of an agency relationship that does not have competitive or other economic value . . . .  [I]n the context of a lawyer-client relationship, confidential client

---

4      The parties do not dispute that the communications Flanigan disclosed in his signed declaration were otherwise subject to the attorney-client privilege.

13

information encompasses all information, not generally known, that relates to representation of the client." (*Id.*, com. c.)

## B. Retaliation under Labor Code section 1102.5

Although employment relationships are generally at will, an employer's right to discharge an employee is still subject to certain limitations based on public policy interests. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 665.) One such public policy interest is embodied in Labor Code section 1102.5, which prohibits employers from retaliating against employees who report suspected violations of the law either internally or to law enforcement agencies (Lab. Code, § 1102.5, subd. (b)) or who refuse to participate in illegal activities (*id.*, subd. (c)).[5]

Subdivision (g) of Labor Code section 1102.5 states: "This section does not apply to . . . actions by employers against employees who violate[] the confidentiality of the lawyer-client privilege of Article 3 (commencing with Section 950) . . . ." (*Ibid.*)

## C. Attorney-client Privilege

" ' "Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a hallmark of our jurisprudence

---

[5]     Labor Code section 1102.5, subdivision (b), provides: "An employer . . . shall not retaliate against an employee for disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . ."

Subdivision (c) of the same section provides: "An employer . . . shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. (*Ibid*.)

14

that furthers the public policy of ensuring ' "the right of every person to freely and fully confer and confide in one having knowledge of the law . . . in order that the former may have adequate advice and proper defense." ' " ' " (*State Comp. Ins. Fund v. Superior Court* (2001) 91 Cal.App.4th 1080, 1086; see also *Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 732 (*Costco*) [the purpose of the privilege " 'is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters' "].)

Codified in Evidence Code section 954, the attorney-client privilege allows the client "to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer . . . ." (Evid. Code, § 952.) "[T]he power to assert and waive the attorney-client privilege held by a corporation belongs to corporate management and is normally exercised by the corporation's officers and directors." (*Melendrez v. Superior Court* (2013) 215 Cal.App.4th 1343, 1353-1354.)

There are no exceptions to the attorney-client privilege unless expressly provided by statute. (*Chubb & Son v. Superior Court* (2014) 228 Cal.App.4th 1094, 1103.)

### D.    Crime-fraud Exception

Evidence Code section 956 creates an exception to the attorney-client privilege, providing that no such privilege exists "if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or fraud." (*Ibid.*) " 'It is the purpose of the crime-fraud exception . . . to assure that the "seal of secrecy" between lawyer and client does not extend to communications made for the purpose of getting advice for the

15

commission of a fraud or crime.' " (*U.S. v. Bauer* (1997) 132 F.3d 504, 509, quoting *U.S. v. Zolin* (1989) 491 U.S. 554.)

To show the crime-fraud exception applies, the party opposing the attorney-client privilege "must make a prima facie showing that the services of the lawyer 'were sought or obtained' to enable or to aid anyone to commit or plan to commit a crime." (*B.P. Alaska, supra,* 199 Cal.App.3d at p. 1262; *State Farm, supra,* 54 Cal.App.4th at p. 643.) Put another way, a party invoking the exception must make a prima facie showing of a crime, as well as " 'a reasonable relationship' " between the crime and the attorney-client communication. (*Bauman & Rose, supra,* 37 Cal.App.4th at p. 1769.)

The crime-fraud exception "cannot open defendant's files or give plaintiffs carte blanche with respect to attorney-client communications. The documents in question must have a reasonable relation to the ongoing [crime or] fraud to be discoverable under the crime-fraud exception." (*BP Alaska, supra*, 199 Cal.App.3d at p. 1269.)

"[E]xtreme caution must be exercised when an accusation is made which will invade the attorney-client relationship in connection with ongoing litigation." (*State Farm*, *supra*, 54 Cal.App.4th at p. 645.)

## II. ANALYSIS

RDL argues that the judgment in Flanigan's favor must be reversed because, as a matter of law, the crime-fraud exception does not apply. We review this issue de novo because it calls upon us to interpret statutes and to apply the law to undisputed facts. (*Meyer v. Sheh* (2022) 74 Cal.App.5th 830, 837.) Where, as here, two statutory schemes are involved, they " ' "must be regarded as blending into each other and forming a single statute

16

. . . . [T]hey ' "must be read together and so construed as to give effect, when possible, to all the provisions thereof." ' " ' " (*Linovitz Capo Shores LLC v. California Coastal Com.* (2021) 65 Cal.App.5th 1106, 1117.)

The attorney-client communications Flanigan disclosed were privileged as a matter of law because the undisputed evidence shows that the crime-fraud exception does not apply.[6] Nothing in the record suggests that the services of Blank Rome were "sought or obtained to enable or aid anyone to commit" perjury. (See *Bauman & Rose, supra*, 37 Cal.App.4th at p. 1768, fn. 4 [crime-fraud exception satisfied when "the entire attorney-client relationship is embarked upon in furtherance of criminal activity"].) Rather, they show RDL's use of its attorneys' services to investigate and defend against the shareholder action. (*State Farm, supra*, 54 Cal.App.4th 625, 644 [record showed client retained attorney to defend it after it was sued; "this falls within the traditional application of the attorney-client privilege"].) Further, there was no evidence of the required nexus between the privileged communications Flanigan revealed and any crime or fraud; Flanigan disclosed the privileged communications when he had no reason to believe they were related to a crime or a fraud. Indeed, he testified that RDL first presented him with the proposed declaration *after* he had already disclosed the attorney-client privileged communications to shareholder plaintiffs (communications which were ultimately relayed in the

---

[6] We do not need to resolve the parties' dispute as to whether the jury made any finding about the crime-fraud exception because we conclude that no reasonable factfinder could have found the exception applicable on this record.

17

declaration he signed).**7** What is more, Flanigan informed shareholder plaintiffs about his communications with Metzger and RDL's attorney not only concerning RDL's internal investigation into Azarraga's alleged misconduct, but also regarding shareholder plaintiffs' allegations against Metzger himself and offsite access to RDL data. This information bears no relationship to any purported perjury. (See *BP Alaska*, at p. 1269 [crime-fraud exception does not "give plaintiffs carte blanche with respect to attorney-client communications"]; *id*. at p. 1271 [although corporate officer's knowledge related to fraud was discoverable, reports prepared during investigation into adversary's claims were not because "[t]here was no showing the investigation itself was fraudulent"].)

Our conclusion that the crime-fraud exception does not apply as a matter of law is the only conclusion consistent with the fundamental purpose of the attorney-client privilege embodied in Evidence Code section 950 et seq. and reinforced by Labor Code section 1102.5, subdivision (g). (See *Pritchard-Keang Nam Corp. v. Jaworski* (8th Cir. 1984) 751 F.2d 277, 284 [decisions about attorney-client privilege "should not be based on a rigid analysis"; rather, "the focus is on whether the detriment to justice from

---

**7** We do not decide whether the declaration RDL asked Flanigan to sign implicated perjury, but we note that the record contains evidence showing Metzger had asked various RDL employees, including Flanigan, Morris, and Kazdan for evidence of Azarraga's alleged HIPAA violation, and that no one provided it to him. Further, RDL's attorney specifically told Flanigan to let him know if he had any questions or comments regarding the proposed declaration. Flanigan merely responded that he "will not be able to sign this statement," and then did not show up for work the next day.

18

foreclosing inquiry into pertinent facts is outweighed by the benefits to justice from a franker disclosure in the lawyer's office"].) Allowing the crime-fraud exception to apply here would significantly undermine the purpose of the privilege. Each time an attorney sent anyone a declaration for review that turned out to contain inaccurate statements, that attorney would be running the risk of waiving attorney-client privilege. Such a risk would chill the "full and open discussion of the facts and tactics surrounding individual legal matter" that the privilege is intended to safeguard. (See *Edwards Wildman Palmer LLP v. Superior Court* (2014) 231 Cal.App.4th 1214, 1225 [purpose is " 'to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters' "]; see also *State Farm*, *supra*, 54 Cal.App.4th at pp. 644-645 ["extreme caution must be exercised when an accusation is made which will invade the attorney-client relationship in connection with ongoing litigation"].)

Indeed, the plain language of subdivision (g) of Labor Code section 1102.5 highlights the primacy of the attorney-client privilege in that it strips employees who violate the privilege of protection from retaliation *whether or not* they also engaged in a protected activity, and regardless of the reasons for termination. (See Lab. Code, § 1102.5, subd. (g) ["This section does not apply . . . to actions by employers against employees who violate[] the confidentiality of the lawyer-client privilege"].)[8] The breadth of

---

[8] Thus, the question the trial court posed at the September 27, 2021 hearing about causation, i.e. whether Flanigan was fired *because of* his disclosure of privileged information, is irrelevant.

19

subdivision (g) also reflects the basic principle that "an employer is entitled to its employees 'undivided loyalty' " during the term of employment (*Fowler*, *supra*, 196 Cal.App.3d at p. 41) and an employee's duty not to use or communicate his employer's confidential information for a third party's purposes (Rest.3d Agency, 8.05).

Because Flanigan's claim for retaliation under Labor Code section 1102.5 fails, so does his corresponding claim for wrongful termination in violation of public policy. The policy underlying the latter claim "must be supported by either constitutional or statutory provisions," and the common law claim cannot be broader than the statute on which it depends. (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890; *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1159; *Dutra v. Mercy Medical Center Mt. Shasta* (2012) 209 Cal.App.4th 750, 756.)

### *DISPOSITION*

The judgment and postjudgment award of attorney fees are reversed, and the matter is remanded to the trial court with instructions to enter a new judgment in favor of defendant. In the interest of justice, the parties are to bear their own costs on appeal.


LEE, J.*

WE CONCUR:



MOOR, Acting P. J.        KIM, J.

---

*     Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


20