[No. C017961. Third Dist. Dec. 21, 1995.]

KENNETH E. STOKES et al., Plaintiffs and Appellants, v.
DOLE NUT COMPANY, Defendant and Respondent.

COUNSEL

Meckfessel, Hopkins & Byrd and Kenneth M. Hopkins for Plaintiffs and Appellants.

Jory, Peterson & Sagaser, Sagaser, Hansen & Franson, Donald R. Franson, Jr., and William M. Woolman for Defendant and Respondent.

OPINION

SPARKS, J.—In this case the plaintiff employees made preparations to establish a competing business. The central issue on appeal is whether the defendant employer had good cause to terminate the employment of plaintiffs under the circumstances. We hold that it did.

Plaintiffs Kenneth E. Stokes and Harley G. Embrey appeal from a summary judgment entered in favor of defendant Dole Nut Company (Dole) in their action for wrongful termination.[1] The matter was submitted to the trial court upon the motions of both sides for summary judgment and was based

---

[1]Defendant Dole's motion for summary judgment was granted with respect to the first and second causes of action of an amended complaint. Those causes of action are based upon the

upon a joint statement of undisputed facts. Under the circumstances presented, the only issues on appeal are whether Dole had sufficient cause to terminate the employment of Stokes and Embrey and, if not, whether the evidence compels the conclusion that their employment was not at will.[2] We agree with the trial court that Dole had sufficient cause for termination and shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' employment with Dole was terminated on August 13, 1991, effective August 16, 1991. Thereafter they timely commenced this litigation. The causes of action relevant to this appeal are the first and second causes of action of the amended complaint, which are for breach of an implied and/or express contract of continued employment, and breach of the implied covenant of good faith and fair dealing. Both sides moved for summary judgment. Plaintiffs asserted the undisputed facts establish that Dole had a contractual duty not to terminate their employment except for cause and that it lacked cause to terminate them. Dole conceded that there is a triable issue of fact whether plaintiffs' employment was at will, but contended that it had good cause for termination as a matter of law. The parties agreed to submit the motions for summary judgment to the trial court based upon a stipulated statement of facts.[3]

Plaintiffs are both long-term employees of Dole at its plant in Orland. The Orland plant receives, processes, packages and ships various types of nut crops, with almonds accounting for about 95 percent of its production. The plant employs about 100 full-time, year-round employees and employs about 300 additional employees on a seasonal basis. Stokes was hired at the Orland

---

alleged wrongful termination of Stokes and Embrey by Dole. The third through seventh causes of action of the amended complaint are based upon the termination of trucking contracts between plaintiffs' wholly owned corporation, the Embrey & Stokes Trucking Co., Inc., and Dole's parent corporation, the Dole Dried Fruit and Nut Company. The summary judgment disposed of all issues between Stokes and Embrey and Dole and is thus ripe for appeal, even though the remainder of the issues tendered by the complaint are still pending in the superior court.

[2]Although Dole maintains that the employment of Stokes and Embrey was at will and would not require good cause for termination, it concedes that there is a triable issue of fact with respect to that question. Stokes and Embrey assert that the record compels the finding that their employment was not at will and request that we not only reverse the judgment in favor of Dole, but that we direct the trial court to grant summary judgment in their favor. Since we find sufficient cause for termination, we need not address this question.

[3]The facts set forth in the stipulated statement are not disputed as a factual matter, and for that reason the parties agreed to include all facts that either side deemed material. However, the parties do not agree that all of the facts set forth are material and, obviously, do not agree on the conclusions to be drawn therefrom.

plant in 1957, and at the time of his termination was the salaried night shift manager for the Orland plant. Embrey was hired at the Orland plant in 1959, and at the time of his termination was the salaried production supervisor for the Orland plant. During their employment with Dole, plaintiffs founded and operated a wholly owned corporation known as Embrey & Stokes Trucking Co., Inc., which Dole utilized to haul crops from growers to the Orland plant.

In October 1988, Embrey purchased 40 acres of property near Corning, about 15 miles from the Orland plant. Eventually 30 acres of that property were planted with olives, and the remaining 10 acres were leveled and fenced. The land was later transferred to Embrey & Stokes Trucking Co., Inc. In May 1989, plaintiffs and their accountants met with two other Dole employees, Skip Hubbard and Tom Mata, to discuss the feasibility of constructing and operating a full service almond processing plant on the 10 acres near Corning. Hubbard was Dole's vice-president in charge of sales and Mata was Dole's vice-president in charge of grower relations. Three such meetings were held in May and June 1989. Also in June, plaintiffs spoke in general terms with representatives of the Bank of America about the possibility of a loan for an almond processing plant. Plaintiffs' accountants produced financial projections for what was termed "Special Project I," to address the feasibility of the project. At that point Hubbard and Mata terminated their involvement due to the projected costs.

During the rest of 1989, plaintiffs' accountants continued to produce financial projections for "Special Project I," using a projected start-up date of 1990. In late 1989, plaintiffs presented their financial projections and other documents to the Bank of America and Wells Fargo Bank in support of a request for a loan for the proposed project. Both banks declined the loan request and plaintiffs suspended their efforts to obtain financing for "Special Project I."

In October 1990, two employees of the Orland plant told Thomas Behncke, the Orland plant manager, that plaintiffs and Joseph Edgar, who had been plant manager and vice-president in charge of operations until his retirement in May 1990, were considering building an almond processing plant in Corning. One of the employees, Miller Cook, said that Stokes had asked him if he would be interested in going to work at the new facility. Behncke was also informed that Gale Wells, the plant maintenance manager, was gathering equipment cost data and providing it to Edgar, Stokes and Embrey for their use in constructing an almond facility. Behncke visited the Corning site and then asked Embrey about it. Embrey told Behncke that he

and Stokes were considering moving their trucking operation from Orland to Corning, and did not tell him that they were considering building an almond processing plant.

In late 1990 and early 1991, plaintiffs were continuing to investigate the possibility of building an almond processing plant. They produced a new proposal, known as "Special Project II," which differed from "Special Project I" in that it eliminated purchasing and marketing of almonds. In other words, in "Special Project II," plaintiffs would provide complete processing of almonds, but growers would retain title to their crops.

Plaintiffs and their accountants determined that the most likely means of financing the project would be through a combination of sources involving governmental guarantees and grants. To this end they prepared a joint resume, a project synopsis, and compiled financial statements and related documents for submission to lenders and agencies. The project synopsis stated that it was the intention of plaintiffs to form a corporation known as Embrey & Stokes Special Project II, for the purpose of constructing and operating an almond processing plant. The plant would provide growers with an alternative to dealing with large companies such as Dole. The synopsis stated that in addition to their knowledge and experience, the plaintiffs had "key contacts with growers" from their employment at Dole and the operation of their trucking business, which would carry over to the new plant. These documents were submitted to North State National Bank. Plaintiffs and their accountants, with the assistance of the bank, then began the process of seeking funding and loan guarantees through the Farmers Home Administration (FmHA), the Butte College Tri-County Small Business Development Center, the Tri-County Economic Development Corporation, and the Tehama Local Development Corporation. In this process plaintiffs received assistance from various agencies, such as the Small Business Development Center, the Tri-County Economic Development Corporation, and the Tehama Local Development Corporation. Embrey told these agencies that he and Stokes wanted to keep the matter confidential, partly because it was no one's business and partly because they did not want Dole to learn of their plans.

In May 1991, plaintiffs and various local agency representatives met with representatives of the FmHA to inquire about a guarantee of a loan to be made by North State National Bank. The agencies agreed to provide funds and to apply for grants, plaintiffs agreed to commit working capital, and the bank agreed to provide a seasonal line of credit. The FmHA representatives agreed that the project met general FmHA requirements, and plaintiffs executed an application for the FmHA loan guarantee program.

In the following months plaintiffs submitted various reports and studies to the FmHA in support of their application. Included was a feasibility study prepared by Cliff Taylor of Taylor Ag Financial. That study indicated that competition for grower accounts would come primarily from Blue Diamond, which handled 55 to 60 percent of the California almond crop, and Dole, which handled about 10 percent of the crop. The study stated that in order to build grower accounts, the plaintiffs would "draw upon the good rapport they have built with local almond farmers during their time with Dole Nut." Although plaintiffs had not met personally with growers to discuss transferring their accounts, Taylor had been given the names of several growers and had discussed the proposed plant and their willingness to move their accounts.

During the summer of 1991, plaintiffs continued to pursue financing for their plant and to this end submitted additional information to the various agencies involved. Some of the grants and/or loans plaintiffs were seeking involved public programs which required that public notice be published. In July 1991 a notice of public meeting was published in the Red Bluff Daily News regarding Tehama County's participation in the Community Development Grant Fund Program. At the same time the Tehama Local Development Corporation asked for a hearing before the Tehama County Board of Supervisors for the adoption of a resolution supporting the project and request for a block grant. In late July and early August 1991, Embrey, upon request of the FmHA, caused a notice to be published in the Corning Daily Observer announcing FmHA's consideration of an application for financial assistance for construction of a nut processing plant in Corning and requesting public comment on the diversion of 10 acres of farmland for the facility. The notice did not identify the applicants or the type of nuts to be processed.

By August 1, 1991, Embrey had received notification from Pacific Gas and Electric Company that electrical service would be available for the plant. On that date he received notice from the state Office of Planning and Research that no state or local agency would be reviewing or objecting to the application for federal assistance and that plaintiffs had complied with appropriate state review procedures.

Between Behncke's discussion with Embrey in October 1990, and August 1, 1991, neither Behncke nor any managerial employee of Dole made any inquiry or investigation into the possibility of plaintiffs starting an almond processing plant. Other than occasional rumors, Dole had no notice that plaintiffs might be pursuing the construction of such a plant. On August 1, 1991, a Dole employee gave Behncke a copy of the FmHA notice and

Behncke faxed a copy of the notice to his supervisor, Lincoln Markwith, in Fresno. Markwith asked Behncke to talk to one of the plaintiffs about the notice. On August 5, 1991, Behncke met with Embrey and asked him about the notice. Embrey confirmed that the proposed plant was his and Stokes's. He said they had a source of almonds lined up but that they were not Dole growers, and said that he did not consider the proposed project to be in competition with Dole. He said they had applied for financing but that it was not yet secured. Behncke advised Markwith of this conversation and provided him with the first three to six pages of the FmHA report on the project. On August 6, 1991, the Corning Daily Observer contained an article about the proposed project and that article was provided to Markwith.

Markwith had three to five meetings with David Payn, Dole's vice-president of human resources, and Timothy Barron, to discuss the situation. They decided to terminate plaintiffs' employment. They believed it would be impossible for plaintiffs to be employees of Dole at the same time as they were in competition with it, and it was noted that plaintiffs, particularly Embrey, had access to confidential company information, including production plans, profit goals, operating problems, and strategies to overcome such problems. Markwith was directed to meet with plaintiffs to inform them of the decision, which was final unless new facts should be brought to his attention. He did so on August 13, 1991, and during the meeting nothing came to light to make Markwith change or delay the termination decision. Consequently, both plaintiffs were terminated.

In the meantime, plaintiffs continued with their attempts to obtain financing for the project. Over the next few months they incorporated the Corning Nut Company and caused the Embrey & Stokes Trucking Co., Inc., to lease the property to the Corning Nut Company. The Tehama County Planning Department announced that the facility complied with zoning regulations and was not subject to the California Environmental Quality Act. North State Bank committed to be the lead financier for the project conditioned upon a 90 percent FmHA guarantee, a $350,000 loan from a Community Development Block Grant, and a $100,000 loan from the Tri-County Economic Development Corporation. The FmHA approved the loan guarantee request and published a notice stating that the project would not require the preparation of a federal environmental impact statement. The state approved a grant award. In December 1991, Gale Wells, the maintenance supervisor at Dole, quit and went to work for the Corning Nut Company. However, in April 1992, plaintiffs learned that the Community Development Block Grant funds were not available and for this and other reasons the planned project was abandoned.

Based upon these facts, the trial court held that Dole had good cause for terminating plaintiffs' employment and granted summary judgment in Dole's favor.

### DISCUSSION

■ Unless agreed otherwise, employment with no specified term may be terminated at the will of either party upon notice to the other. (Lab. Code, § 2922.) However, the parties may agree otherwise and such an agreement may be express or implied. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [254 Cal.Rptr. 211, 765 P.2d 373].) ■ Where an employer expressly or impliedly promises not to terminate an employment except for sufficient cause, the employee may recover damages for wrongful termination of the employment contract if the employer does so. (*Ibid.*) "The terms 'just cause' and 'good cause,' 'as used in a variety of contexts . . . have been found to be difficult to define with precision and to be largely relative in their connotation, depending upon the particular circumstances of each case.' [Citation.] Essentially, they connote 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' [Citation.] Care must be taken, however, not to interfere with the legitimate exercise of managerial discretion. 'Good cause' in this context is quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term. (Cf. Lab. Code, § 2924.) And where, as here, the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment." (*Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 330 [171 Cal.Rptr. 917], fn. omitted. See also *Moore* v. *May Dept. Stores Co.* (1990) 222 Cal.App.3d 836, 839-840 [271 Cal.Rptr. 841]; *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 769 [250 Cal.Rptr. 195]; *Crosier* v. *United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132, 1140 [198 Cal.Rptr. 361].)

■ Plaintiffs' employment with Dole was terminated because they were actively involved in an attempt to establish a business that would compete directly against Dole, and Dole determined that their actions constituted a lack of loyalty and created conflicts of interest. Plaintiffs, however, assert that mere preparations to compete, whether or not disclosed, cannot be cause for termination.

Plaintiffs rely upon the decision in *Bancroft-Whitney Co.* v. *Glen* (1966) 64 Cal.2d 327 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795]. There is language in that decision that, at first blush, would seem to support plaintiffs' argument. Thus, the high court said: "The mere fact that the officer

makes preparations to compete before he resigns his office is not sufficient to constitute a breach of duty. It is the nature of his preparations which is significant. No ironclad rules as to the type of conduct which is permissible can be stated, since the spectrum of activities in this regard is as broad as the ingenuity of man itself." (64 Cal.2d at p. 346, fn. omitted.) The court noted that some cases suggest that full disclosure is determinative. However, the court noted: "There is no requirement that an officer disclose his preparations to compete with the corporation in every case, and failure to disclose such acts will render the officer liable for a breach of his fiduciary duties only where particular circumstances render nondisclosure harmful to the corporation. [Citations.] Conversely, the mere act of disclosing his activities cannot immunize the officer from liability where his conduct in other respects amounts to a breach of duty. The significant inquiry in each situation is whether the officer's acts or omissions constitute a breach under the general principles applicable to the performance of his trust." (*Id.* at p. 347.)

We conclude the decision in *Bancroft-Whitney* is not determinative here for two reasons. First, and most significantly, that case did not involve the same issue we are considering. In that case the former employer was seeking compensation in tort, including punitive damages, for the former employee's breach of fiduciary duties resulting from the employee's efforts on behalf of a competitor while still employed by the plaintiff-employer. Accordingly, the court was concerned with identifying the types of actions by an employee that will constitute tortious misbehavior so as to give rise to a cause of action in the employer. It was not concerned, as we are, with the type of activities which would constitute cause for termination of the employment contract. Second, the court found the employee's actions in that case to have been a clear breach of his fiduciary duties as a matter of law, that is, "they show a course of conduct which falls demonstrably short of 'the most scrupulous observance' of an officer's duty to his corporation." (64 Cal.2d at p. 348.) Since the employee's behavior in that case was so clearly over the line, the decision does not purport to describe a minimum standard of conduct for employees.

Plaintiffs' argument assumes that the standard for termination with cause is identical to the standard for tortious behavior by an employee. However, we have found no authority for the proposition that to constitute cause for termination an employee's conduct must amount to a criminal or civil wrong. Rather, as we have noted, cause for termination must be a fair and honest cause or reason under the particular circumstances of the case and with due deference to the legitimate exercise of managerial discretion. In applying this standard it would be anomalous to hold that an employer must

wait to take action until an employee actually causes it tortious injury. In fact, it is a fundamental principle of our law that a potential victim has a duty to avoid injury, and this principle is illustrated in such doctrines as waiver and estoppel, the tort defense of consent, principles of comparative fault and assumption of the risk, the rule of avoidable consequences, and the duty to mitigate damages. Accordingly, we conclude that where an employer seeks to terminate an employee for cause based upon the employee's activities with respect to an established or prospective competitor, it is no answer that the employee has not yet tortiously injured the employer. This is not to say that an employee can invariably be terminated without recourse for any action undertaken with respect to the prospect of future competition with the employer. Instead, we hold only that actions short of tortious misbehavior may support termination when considered in the circumstances of the particular case involved.

In this respect we find instructive the decision in *Fowler* v. *Varian Associates, Inc.* (1987) 196 Cal.App.3d 34 [241 Cal.Rptr. 539]. In that case the plaintiff-employee became involved in the efforts of a former employee to establish a business that would be in competition with the defendant-employer. The plaintiff-employee attended some meetings, provided some ideas or suggestions, assisted in efforts to obtain financing, and considered becoming a partner in the new business, although ultimately he did not join that enterprise. The Court of Appeal noted that an employee may seek other employment and may even make some preparations to compete, but held that an employee may not transfer his loyalty to a competitor. Thus, "[d]uring the term of employment, an employer is entitled to its employees' 'undivided loyalty.'" (196 Cal.App.3d at p. 41; see also *Sequoia Vacuum Systems* v. *Stransky* (1964) 229 Cal.App.2d 281, 287 [40 Cal.Rptr. 203]; *Daniel Orifice Fitting Co.* v. *Whalen* (1962) 198 Cal.App.2d 791, 798, 800-801 [18 Cal.Rptr. 659]; *Puritas Laundry Co.* v. *Green* (1911) 15 Cal.App. 654, 660 [115 P. 660].) The *Fowler* court held that the defendant-employer had good cause to terminate the plaintiff-employee's employment as a matter of law, based upon either the plaintiff-employee's refusal to disclose his information about the competitor or his assistance in obtaining financing for an enterprise organized to become a direct competitor. (*Fowler* v. *Varian Associates, Inc., supra*, 196 Cal.App.3d at p. 43.)

█ As *Fowler* and the other decisions cited above reflect, an employer has the right to expect the undivided loyalty of its employees. The duty of loyalty is breached, and may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer. But an employer is not required to retain an employee while awaiting the commission of a tort. " 'It would be monstrous to hold that the

master was bound to retain the servant in his employment after he has thus voluntarily put himself in an attitude hostile to his master's interests.' " (*Puritas Laundry Co.* v. *Green, supra,* 15 Cal.App. at p. 660.) Thus, an employer is entitled to be concerned with conflicts of interest among its employees regardless whether an employee has engaged in an actual and provable wrong. It is a "self-evident truth, as trite and impregnable as the law of gravitation" that "a person cannot serve two masters simultaneously." (*Stockton P. & S. Co.* v. *Wheeler* (1924) 68 Cal.App 592, 601 [229 P. 1020]; *Thomson* v. *Call* (1985) 38 Cal.3d 633, 637 [214 Cal.Rptr. 139, 699 P.2d 316].) An impairment of judgment can occur in even the most well-meaning employee when his or her personal interests are affected. (*Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 570 [25 Cal.Rptr. 441, 375 P.2d 289].) Accordingly, an employer's right to undivided loyalty is compromised when an employee's outside activities give rise to a possibility of personal influences. (*Id.* at p. 569; see also *Thomson* v. *Call, supra,* 38 Cal.3d at p. 648.) The point at which an employee's outside activities warrant termination is dependent upon the particular circumstances of the case, with appropriate deference to the exercise of managerial discretion.

■ We have set forth previously the facts of this case and need not repeat them here. Based upon these facts we agree with the trial court that Dole had sufficient cause for terminating plaintiffs' employment. Plaintiffs were managerial or supervisorial-level employees. They, and particularly Embrey, had access to confidential company information. Extensive acts had been performed by them, or by their agents on their behalf, toward the objective of establishing a competing business. The documents they produced in support of their efforts to establish the competing business show that they understood they would be in competition with Dole and that they intended to rely upon the "key contacts" they had made through their employment with Dole in competing successfully with it. Under these circumstances Dole could properly conclude that it would be difficult, or even impossible, for plaintiffs to pursue Dole's interests with undivided loyalty. It was not necessary for Dole to wait to see whether they would engage in actual tortious misconduct; their outside activities had progressed to the point that conflicts of interest compromised Dole's right to their undivided loyalties. This was sufficient cause for termination.

Our conclusion that Dole had sufficient cause for termination of plaintiffs' employment requires that we affirm the judgment in Dole's favor on both the cause of action for breach of the employment contract and the cause of action for breach of the implied covenant of good faith and fair dealing. (See *Pugh* v. *See's Candies, Inc., supra,* 203 Cal.App.3d at pp. 770-771; *Burton* v. *Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972, 978-979 [243 Cal.Rptr. 277].)

## DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Raye, J., concurred.