Filed 5/27/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GUILD MORTGAGE COMPANY LLC, Plaintiff and Appellant, v. CROSSCOUNTRY MORTGAGE LLC, Defendant and Respondent. | D085036, D085273 (Super. Ct. No. 37-2022-00051488-CU-BT-CTL) |

CONSOLIDATED APPEALS from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge. Reversed.

Sidley Austin, Rollin A. Ransom, David R. Carpenter, Eric B. Schwartz and Nicole M. Baade for Plaintiff and Appellant.

Jones Day, Rick Bergstrom, David Phillips and Matthew J. Silveira for Defendant and Respondent.

Guild Mortgage Company LLC (Guild) appeals from a judgment entered in favor of CrossCountry Mortgage LLC (CCM) following orders sustaining CCM's demurrers without leave to amend. Guild contends the trial court erred in concluding: (1) that three Guild employees who transferred their allegiance to CCM while still employed by Guild owed no actionable common law duty to Guild and that Guild thus could not state a claim against CCM for aiding and abetting a tort; (2) that Civil Code section

3426 et seq. (California's Uniform Trade Secrets Act or CUTSA[1]) preempted four of Guild's other claims; and (3) that Guild's claim for unfair competition was defeated by an inability to state a predicate claim.  We agree with Guild.  Hence we reverse the judgment.

## I.    BACKGROUND

### A.    Allegations of the First and Second Amended Complaints

According to the allegations of the first and second amended complaints, Guild and CCM are rival nationwide residential mortgage lenders.

#### 1.    *The Conspiracy*

During an 18-month period commencing in January 2020, CCM induced and conspired with several of Guild's Kirkland, Washington branch employees to gut the branch by (1) recruiting their colleagues at Guild to come to work for CCM, (2) diverting Guild's customers to CCM, and (3) converting Guild's pipeline of active loan applications to CCM—all while those employees were still employed, and being paid, by Guild.

In furtherance of the conspiracy, CCM and its coconspirators accessed Guild's computer system and, without Guild's knowledge or authorization, copied valuable confidential information that was stored on the system and then used that information to help CCM gain a competitive advantage over Guild.  Such information included: "detailed public and non-public information relating to numerous potential borrowers who had submitted

---

1    Civil Code section 3426 states:  "This title [comprised of sections 3426 through 3426.11] may be cited as the Uniform Trade Secrets Act."  In keeping with this statement, some authorities refer to section 3426 et seq. as the UTSA.  Because these sections deviate in material respects from the model uniform act on which they are patterned and from other states' versions of the model uniform act (see *post*), we refer to them as CUTSA (signifying the UTSA in the form in which it was enacted by the California Legislature).

2

loan applications with Guild," "confidential [customer] financial information," "loan-level financial information," "confidential employee compensation and contact information," and various other types of information developed or compiled by Guild.[2]

### 2. *The Coconspirators at Guild*

Among the conspirators was the person Guild had entrusted to oversee the company's business in Kirkland—Christopher Flowers—who, as Guild's Kirkland branch manager, "participated in the management of the company, exercising discretionary authority," "was given a tremendous amount of trust," "was responsible for hiring and supervising mortgage loan officers," "was . . . imbued with tremendous latitude with how the branch was run, how expenses [were] managed, and . . . the profitability of the branch to the corporate entity," and was "trusted to ensure that loans [were] originated in compliance with . . . fair lending and consumer regulations." Also among the conspirators at Guild was senior loan officer, Cory Flynn, and branch operations manager, Lisa Joliffe.

Flowers, Flynn, and Joliffe engaged in the conduct described *ante* despite having entered into employment agreements—of which CCM was or should have been aware—in which they had promised not to solicit or divert Guild clients, potential clients, or employees and not to act as agents for a competitor.

---

[2] Guild has alleged in its complaints that this information was "not a trade secret"; asserting Guild is "*not* alleg[ing] any misuse, misappropriation, or other misconduct by CCM with respect to trade secrets, or anything similar." However, we disregard this allegation inasmuch as it is a conclusion of law, not fact. (*People ex rel. Henggeler v. Dauod* (2026) 117 Cal.App.5th 939, 949 (*Henggeler*) [conclusions of law are excluded from matters deemed admitted on demurrer].)

3

### 3. *The Fallout*

The conspiracy resulted in a mass resignation of all or virtually all of the dozens of Guild employees who had been working at the Kirkland branch, in CCM's hiring of many of those employees—including Flowers, Flynn, and Joliffe—and in Guild "essentially los[ing] the entire Kirkland branch."

## B. Legal Proceedings

### 1. *Arbitration Against Former Employees*

During 2021, the year in which the exodus of employees occurred, Guild initiated an arbitration against Flowers, Flynn, and Joliffe; and in 2023, the arbitrator issued an award finding in favor of Guild, ordering Flowers to pay it $10,605,359 in lost profits, exemplary damages, restitution, attorneys' fees and costs, and ordering Flynn and Joliffe to pay $113,478 and $17,642, respectively, in restitution.

### 2. *Lawsuit Against CCM*

#### a. Original Complaint and Demurrer

During 2022, while the arbitration was pending, Guild initiated this lawsuit with the filing of a complaint against CCM. In the complaint, Guild alleged claims for: (1) intentional interference with prospective economic advantage; (2) negligent interference with prospective economic advantage; (3) tortious interference with contract; (4) violation of Penal Code section 502 (the Comprehensive Computer Data Access and Fraud Act or CCDAFA); and (5) unfair competition pursuant to Business & Professions Code section 17200 et seq. (the Unfair Competition Law or UCL). CCM responded by filing a demurrer in which it argued that Guild had not alleged facts sufficient to constitute a cause of action as to any of its claims. The trial court agreed with CCM on the ground that each of the five claims was "preempted" by CUTSA. So doing, it sustained the demurrer as to all five claims, but granted Guild leave to amend.

4

### b.    First Amended Complaint and Demurrer

In 2023, Guild filed a first amended complaint in which it asserted the same five claims as before, plus a claim for "aiding and abetting tort."[3]  CCM responded by again filing a demurrer attacking all of the claims, and the trial court again agreed with CCM.

Specifically, the court concluded that:  1) the claim for aiding and abetting a tort was defective because Guild had not alleged facts sufficient to support a conclusion that Flowers, Flynn, or Joliffe owed Guild an actionable duty the breach of which CCM could have aided and abetted; 2) the claims for interference with contract, intentional interference with prospective economic advantage, and negligent interference with prospective economic advantage (the interference claims) and the CCDAFA claim were preempted by CUTSA; and 3) the UCL claim was defective because Guild had not alleged harm to competition (as distinguished from harm only to Guild).

On these grounds, the trial court sustained the demurrer as to each of the claims just discussed.  Although it granted leave to amend, it did so only with respect to the claim for aiding and abetting tort and the UCL claim.

### c.    Second Amended Complaint and Demurrer

In 2024, Guild filed a second amended complaint.  In this pleading it realleged the two claims it had been granted leave to amend, supporting them with some of the same allegations as before along with additional

---

[3]    Guild also asserted a seventh claim in the first amended complaint. This claim, for "breach of contract benefitting third-party beneficiary," was premised on allegations (1) that Guild had been the third party beneficiary of a contract between CCM and Flowers in which CCM agreed to indemnify its coconspirators at Guild and (2) that Guild had breached the indemnification contract by refusing to pay the arbitration award.  The trial court sustained CCM's demurrer as to this claim; but we do not discuss the claim further, as Guild appears to have abandoned it on appeal.

5

allegations that had not been included in either of the first two complaints. CCM responded by filing another demurrer.[4] The trial court once more agreed with CCM that Guild had not alleged facts sufficient to constitute a cause of action. Thus it sustained the demurrer as to the two remaining claims. But this time it denied leave to amend.

### d. Entry of Judgment and Appeal

After the trial court issued its order sustaining the third of the three demurrers, it entered judgment against Guild and in favor of CCM. Guild timely appealed.

## II. DISCUSSION

Guild contends the trial court erred in sustaining the demurrers. " ' " 'On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint alleges facts sufficient to state a cause of action under any possible legal theory.' " ' " (*Henggeler, supra,* 117 Cal.App.5th at p. 949.) " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law," ' " and " ' " 'we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.' " ' " (*Ibid.*) If the plaintiff has stated a cause of action under any possible legal theory, we must reverse. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

### A. The Claim Asserting Aiding and Abetting a Tort

As noted *ante,* Guild contends the trial court erred in sustaining CCM's demurrer on the claim for aiding and abetting a tort. This claim asserted

---

4    CCM also filed a motion for summary adjudication in response to the second amended complaint. But the trial court's ruling on CCM's demurrer to that complaint mooted the motion.

6

that CCM "gave substantial assistance or encouragement to [Guild's] then-current . . . employees" in "a common plan or design to commit tortious acts against Guild" and that those tortious acts included, among other things, "breaches of fiduciary duty and [the] duty of loyalty." In challenging the claim below, and in arguing that the judgment should be affirmed on appeal, CCM asserts none of the individuals who it is alleged to have aided and abetted owed Guild any such duties. We disagree.

### a. Duty of Loyalty

Insofar as the first of the two types of predicate duties that Guild has alleged (a duty of loyalty) is concerned, it is the law in this state that "an employee, while employed, owes undivided loyalty to his employer." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 414 (*Huong Que*), citing *Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 41 (*Fowler*); see also Lab. Code, § 2863 ["An employee who has any business to transact on his own account, similar to that intrusted to him by his employer, shall always give the preference to the business of the employer."].) "While California law does permit an employee to seek other employment and even to make some 'preparations to compete' before resigning . . . , [it] does not authorize an employee to transfer his loyalty to a competitor." (*Fowler,* at p. 41.) "The duty of loyalty is breached, and the breach 'may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.' " (*Huong Que,* at p. 414, quoting *Stokes v. Dole Nut Co.* (1995) 41 Cal.App.4th 285, 295.)

In arriving at a conclusion to the contrary, the trial court relied on *AMN Healthcare, Inc. v. Aya Healthcare Services, Inc.* (2018) 28 Cal.App.5th 923, in which the court held that an employee's duty not to disclose her employer's confidential information had arisen from a confidentiality agreement into which she had entered with the employer and, in the

7

alternative, that "any breach of such duty would be grounded in contract, not tort." (*Id.,* at p. 941, citing *Aas v. Superior Court* (2000) 24 Cal.4th 627, 643 (*Aas*) and *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 (*Applied Equipment*).)  But, for each of two independent reasons, we conclude *AMN* is inapposite.

First, *AMN* did not consider *Huong Que*, *Fowler*, *Stokes*, or Labor Code section 2863.  Second, the precedents on which *AMN* relied in arriving at its alternative holding do not support abrogation of those authorities.  Indeed, *Aas* merely stands for the principle that " ' "[c]ourts will generally enforce the breach of a contractual promise through contract law*, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.*" ' " (*Aas*, *supra,* 24 Cal.4th at p. 643 (italics added) [concluding that failure to perform contract in a competent and reasonable manner is not a tort because a person "may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations"].)  And *Applied Equipment* similarly affirms that, whereas "[c]ontract law exists to enforce legally binding agreements[,] . . . tort law is designed to vindicate social policy." (*Applied Equipment*, *supra,* 7 Cal.4th at p. 515.)  As *Huong Que*, *Fowler*, *Stokes*, and Labor Code section 2863 make clear, conduct of the sort alleged in the present case violates a social policy meriting imposition of tort

remedies.  (*Huong Que, supra*, 150 Cal.App.4th at p. 414.[5])  Accordingly, to the extent *AMN* can be read to hold that California does not impose an actionable duty of loyalty on employees, we decline to follow it.

### b.      Fiduciary Duties

As for the second of the two types of predicate duties that Guild has alleged (fiduciary duties), CCM contends Flowers cannot be held to have owed such a duty by operation of law[6] because he was merely a branch manager.  In support of this contention, CCM cites *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.* (2000) 83 Cal.App.4th 409, 420–421 (*GAB*) for the proposition that "the law imposes fiduciary duties only on *officers* who participate in the management of *the corporation* and exercise some *discretionary* authority over it."  But this is not what *GAB* says.

---

[5]      Federal authorities are generally in accord.  (See *Cardinal v. Lupo* (N.D.Cal., Sept. 17, 2019, No. 18-cv-00272-JCS) 2019 WL 4450859, p. *11 [" 'the California Supreme Court would likely follow the Restatement [of Agency] to recognize that [even] a lower-level employee, such as a sales clerk or a laborer, owes a duty of loyalty to his employer' capable of supporting a claim for breach of that duty"]; *Zayo Group LLC v. Hisa* (C.D.Cal., Sept. 17, 2013, No. SACV 13-752-JST(JPRx)) 2013 WL 12201401, p. *7 [same]; *Otsuka v. Polo Ralph Lauren Corp.* (N.D.Cal., Nov. 9, 2007, No. C07-02780(SI)) 2007 WL 3342721, pp. *2–3 [same]; see also *Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.* (E.D.Cal. 2008) 556 F.Supp.2d 1122, 1142; but see *Mattel, Inc. v. MGA Entertainment, Inc.* (C.D.Cal., Mar. 28, 2011, No. CV 04-9049 DOC(RNBx)) 2011 WL 8427611, p. *1 [rejecting principle that "every employee, regardless of rank or responsibility, owes his employer a duty of loyalty" and asserting "non-fiduciary employees owe no duty of loyalty to their employees"].)

[6]      As the parties acknowledge, fiduciary duties may arise by operation of law or by agreement.   Because we conclude *post* that such duties arose by operation of law at least as to Flowers in this case, we need not address whether they also arose by virtue of the former Guild employees' employment agreements.

9

In *GAB*, the plaintiff (GAB) sued a former regional vice-president, Neal, and Neal's new employer, Lindsey, "for their respective roles in soliciting 17 key GAB employees to resign en mass in order to join Neal in new positions at Lindsey. GAB claimed Neal breached his fiduciary duty in orchestrating the exodus while still an officer at GAB. GAB accused its competitor Lindsey of unfair competition in assisting and benefiting from Neal's breach of fiduciary duty." (*GAB, supra,* 83 Cal.App.4th at pp. 412–413.) Not unlike Flowers in the present case (see *ante*), Neal "was 'at the top of [the] organizational structure' for the . . . region" over which he presided for the company (*id.*, at p. 422), with responsibility for " 'planning, sales, quality control, budgeting and the performance of the region.' " (*Id.*, at p. 413.) In considering whether Neal was a fiduciary of GAB, the court observed: (1) that, at one end of the spectrum, "an officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law"; (2) that, at the other end of the spectrum, "a 'nominal' officer with no management authority is *not* a fiduciary"; and (3) that "[w]hether a particular officer participates in management is a question of fact." (*Id.,* at pp. 420–421, italics added.) Guided by these observations, the court went on to find that "the evidence clearly established" Neal had been a fiduciary of GAB. (*Id.,* at pp. 421–422.)

> "Defendants' attempts to characterize Neal as a nominal officer with no real authority are unconvincing. Defendants argue that he lacked the authority to take 'unilateral' actions in areas such as hiring, firing, or signing documents as an officer. But the test for fiduciary status is not control; it is, instead, merely participation in management. This low threshold is easily met in this case." (*GAB, supra,* 83 Cal.App.4th at p. 422.)

That Flowers in the present case held the title of branch manager rather than, say, vice-president is immaterial. (See, e.g., *Hiossen, Inc. v. Kim*

(C.D.Cal., Aug. 17, 2016, No. CV 16-01579 SJO (MRWx) 2016 WL 10987365, p. *16 [rejecting branch manager's argument that, "because [he] was not an officer of [his employer], he owed no fiduciary duties to" it].) In determining the existence of an employee's fiduciary duty arising by operation of law, what matters is not one's title, but rather the levels of trust, confidence, and discretion reposed by the employer.

Crediting the factual allegations in the complaints as at this point in the proceedings we must (*Henggeler, supra,* 117 Cal.App.5th at p. 949), Guild had entrusted to Flowers the stewardship of a sizeable branch and had reposed in him a high level of trust and confidence to steer the efforts of dozens of employees in advancing the company's best interests and safeguarding the confidentiality of its customers' sensitive financial information. But he instead recruited his subordinates to leave Guild and instead work for CCM, a rival, and to convert Guild's customers and their loan applications to CCM, breaching not only the duty of loyalty they owed to the company but also obligations the company owed to its clientele,[7] and causing the mass resignation of virtually all of the Guild employees at the branch.

Based on the foregoing analysis, we have no difficulty concluding that, if the allegations in the complaints can be proven, then Flowers, Flynn, and Joliffe owed and breached a duty of loyalty to Guild; Flowers owed and breached fiduciary duties to Guild; and CCM aided and abetted such breaches.

---

[7]    As noted *ante*, confidential customer financial information is among the items that the conspirators were alleged to have clandestinely taken from Guild's computer system.

11

**B.    The Interference Claims**

Guild also contends the trial court erred in sustaining CCM's demurrer on the interference claims.  In support of the first of these three claims—the claim for tortious interference with contract—Guild alleged that CCM had intentionally induced Flowers, Flynn, Joliffe, and other Guild employees to breach loyalty and confidentiality provisions in their employment contracts.  In support of the second interference claim—the claim asserting "intentional interference with prospective economic advantage"—Guild alleged that "CCM intentionally disrupted Guild's business operations and relationships with borrowers and prospective borrowers."  In support of the third interference claim—the claim asserting "negligent interference with prospective economic advantage"—Guild added an allegation that CCM owed Guild a duty of care.

CCM contends the trial court was correct in sustaining the demurrers with respect to the interference claims.  In support of this contention it makes two arguments.  First, it argues that the interference claims are displaced by CUTSA.  Second, it argues that whether or not the claims are displaced by CUTSA, they "fail on the merits because they do not allege any independently wrongful act."  Again, we disagree.

### 1.    *CCM's Merits Argument*

The second of the two arguments just cited is disposed of by our analysis *ante* with respect to Guild's claim for aiding and abetting a tort.  In this regard, the thrust of CCM's merits argument is a syllogism to the effect that (in CCM's words):

1. "[A]ll of [the] interference claims require [Guild] to plead that CCM's conduct was 'wrongful by some legal measure other than the fact of interference itself' " (quoting in part *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1142).

2. Yet "Guild has pleaded no viable independently wrongful act."

3. Thus "Guild's tortious interference claims fail on the merits."

In support of the assertion that "Guild has pleaded no viable independently wrongful act," CCM argues (among other things) that "Guild's theory that the employees breached fiduciary duties and duties of loyalty fails because they had no such duties."

But as we have concluded in our analysis of Guild's claim for aiding and abetting a tort (see *ante*), Guild has alleged facts that, if proven, would support a conclusion that in fact Guild's employees *did* owe Guild a duty of loyalty, and that Flowers owed Guild a fiduciary duty as well. Hence, at the demurrer stage of proceedings, the interference claims do not fail on the merits. (See, e.g., *Angelica Textile Services, Inc. v. Park* (2013) 220 Cal.App.4th 495, 508 (*Angelica*) [former employee's breach of duty of loyalty was suitable basis on which to base claim of interference with business relations; affirming summary judgment against former employee and company for whose benefit he breached the duty].)

We turn next to CCM's argument that the interference claims are displaced by CUTSA.

## 2. *CCM's CUTSA Displacement Argument, as Applied to Guild's Interference Claims*

### a. CUTSA

CUTSA was enacted in September of 1984 (Stats. 1984, ch. 1724, § 1, p. 6252) with an intention of introducing order to what has been described as a "notoriously haphazard web of disparate laws governing trade secret liability." (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210,

13

233.)  But the phraseology of CUTSA has at times rendered efforts to delineate the scope of that intended order vexing.

To illustrate, one oft-quoted provision of CUTSA says that:  "This title [comprised of Civil Code sections 3426 through 3426.11] shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this title among states enacting it."  (Civ. Code, § 3426.8.)  Yet this general purpose of achieving uniformity is frustrated by the fact that CUTSA deviates in material respects from the uniform act (UTSA) on which it is patterned and from the forms in which other states have enacted the UTSA.  (See *K.C. Multimedia, supra,* 171 Cal.App.4th at pp. 955–956 [discussing implications of substantive differences among Civil Code section 3426.7, corresponding section of UTSA, and corresponding sections of other states' enactments of UTSA.]; see also *Silvaco, supra,* 184 Cal.App.4th at p. 232 [describing Civil Code section 3426.7 as "vexingly oblique"].)

The intention of introducing order also is undercut by a savings provision in which CUTSA (1) makes clear that the civil remedies it

authorizes (see Civ. Code §§ 3426.2–3426.4) do not displace[8] *all* other civil remedies touching on trade secrets, yet (2) speaks in ambiguous terms as to which of such other civil remedies retain their efficacy and which instead are displaced.  This provision states that:

> "(a) Except as otherwise expressly provided, this title does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets.

> "(b) This title does not affect (1) contractual remedies, whether or not based upon misappropriation of a trade secret, (2) other civil remedies that are not based upon misappropriation of a trade secret, or (3) criminal remedies, whether or not based upon misappropriation of a trade secret."  (Civ. Code, § 3426.7.)

Observing that CUTSA is "comprehensive" in "structure and breadth," California courts have described the Act as "occup[ying] the field" "[a]t least as to common law trade secret misappropriation claims" (*K.C. Multimedia, supra,* 171 Cal.App.4th at pp. 954, 957–958) and in some instances have gone further than this by asserting that CUTSA displaces "all claims premised on the wrongful taking and use of confidential business and proprietary

---

8       Some authorities use the terms "preempt" and "preemption" to refer to CUTSA's displacement of certain other provisions of California law.  (See, e.g., *K.C. Multimedia, supra,* 171 Cal.App.4th 939 [discussing the effect of CUTSA in terms of "preemption"].)  But this usage is incorrect.  (See *Zengen, Inc. v. Comerica Bank* (2007) 41 Cal.4th 239, 247, fn. 5 (*Zengen*) ["the doctrine of preemption concerns whether a federal law has superseded a state law or a state law has superseded a local law, not whether one provision of state law has displaced other provisions of state law"]; accord *Silvaco, supra*, 184 Cal.App.4th at p. 232, fn. 14; *Angelica, supra,* 220 Cal.App.4th at p. 498, fn. 1.)  Other authorities, and the parties here, use the term "supersession."  (See, e.g., *Silvaco*, at p. 232, fn. 14.)  In keeping with a preference expressed by our Supreme Court (*Zengen,* at p. 247, fn. 5; see also *Angelica,* at p. 498, fn. 1), we use the terms "displace" and "displacement."

15

information, even if that information does not meet the statutory definition of a trade secret."[9] (*ChromaDex, Inc. v. Elysium Health, Inc.* (C.D.Cal. 2019) 369 F.Supp.3d 983, 989, citing *Silvaco, supra,* 184 Cal.App.4th at p. 239, fn.

[9] The views expressed in such instances are not without cogent opposing views expressed by courts and commentators who maintain that CUTSA, by its terms, leaves room for the protection of commercially valuable confidential information that does not satisfy the definition a trade secret. (See, e.g., *Leatt Corp. v. Innovative Safety Technology, LLC* (S.D.Cal., July 15, 2010, No. 09-CV-1301-IEG(POR)) 2010 WL 2803947, *6; *Think Village-Kiwi, LLC v. Adobe Systems, Inc.* (N.D.Cal., Apr. 1, 2009, No. C 08-04166 SI) 2009 WL 902337, *1–3; Vakili & Zabb, *Secret Preemption: Silvaco Ignores Principles of Statutory Interpretation and California Trade Secret Law* (Sept. 2013) 36 Los Angeles Lawyer 21 [describing the reasoning in *Silvaco, supra,* 184 Cal.App.4th 210, as "flawed"]; see generally 2 Jager & Lane, Trade Secrets Law (2025) The Trade Secrets Law of California, § 22:7 ["The California courts continue to struggle with the 'vexingly oblique' preemption provisions of the Uniform Trade Secrets Act."]; Warrington & Parker, *The Differing Approaches to Preemption Under the Uniform Trade Secrets Act* (2014) 49 Tort, Trial & Ins. Prac. L.J. 645 [examining "the various views taken by different courts on how to treat non-trade secret confidential information"]; Kargman & Hernandez, *Weapon of Choice: The State Supreme Court May Have to Decide Whether the California Uniform Trade Secrets Act Preempts Common Law Claims* (Feb. 2010) 32 Los Angeles Lawyer 27; Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Information" Not Rising to the Level of Trade Secrets* (1998) 29 Loy. U. Chi. L.J. 841.)

16

22;[10] see also *K.C. Multimedia, supra,* at p. 958 ["we agree with the federal cases applying California law, which hold that section 3426.7, subdivision (b), preempts common law claims that are 'based on the same nucleus of facts as

---

10 In the cited footnote, the *Silvaco* court said "a prime purpose of [CUTSA] was to sweep away the adopting states' bewildering web of rules and rationales and replace it with a uniform set of principles for determining when one is—and is not—liable for acquiring, disclosing, or using '*information . . . of value.*' " (*Silvaco, supra,* 184 Cal.App.4th at p. 239, fn. 22, italics added.) But CUTSA itself does not speak in terms of acquiring, disclosing, or using "information of value." Rather, it speaks in terms of acquiring, disclosing, or using (Civ. Code, § 3426.1, subd. (b)(1) and (2)) information *that qualifies as a "trade secret."* (Civ. Code, § 3426.1, subd. (d).) And its definition of "trade secret" makes clear that the term does not encompass all types of information that is "of value." (*Ibid.* [" 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."].)

 In this same footnote, the *Silvaco* court also said " 'information' cannot be 'stolen' unless it constitutes *property*" and that "information is not property unless some law makes it so." (*Silvaco, supra,* 184 Cal.App.4th at p. 239, fn. 22.) This statement notwithstanding, we note that confidential business information is routinely recognized as constituting property irrespective of whether it also satisfies the definition of a trade secret. (See, e.g., *Carpenter v. U.S.* (1987) 484 U.S. 19, 26 ["Confidential business information has long been recognized as property."]; *Courtesy Temporary Service, Inc. v. Camacho* (1990) 222 Cal.App.3d 1278, 1288 ["A list of customers or subscribers 'built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer."]; *Greenly v. Cooper* (1978) 77 Cal.App.3d 382, 392 ["Trade and business secrets *and* confidential information are the property of the employer" and "a part of the good will of his business;" italics added].) Indeed, in the employment agreements placed at issue in this case, Flowers, Flynn, Joliffe, and Guild agreed that "trade secrets" are just one of several different types of "confidential information" constituting "the sole and exclusive property of" Guild.

17

the misappropriation of trade secrets claim for relief' "; quoting in part *Digital Envoy, Inc. v. Google, Inc.* (N.D.Cal. 2005) 370 F.Supp.2d 1025, 1035].)

But regardless of whether CUTSA displacement is construed broadly or narrowly (see *K.C. Multimedia, supra*, 171 Cal.App.4th at 957) and regardless of whether CUTSA displaces not only claims based on misappropriation of trade secrets, but also claims based upon wrongful taking and use of confidential or proprietary information (see *Silvaco, supra*, 184 Cal.App.4th at p. 239, fn. 22), courts look to the gravamen of the complaint (its "gist") to determine whether CUTSA displaces a common law cause of action. Thus, for example, *K.C. Multimedia* noted that the displacement analysis "strongly suggests a factual inquiry, one that examines the conduct alleged in the claim" and focuses on "'the actual gravamen of [the] complaint'" to determine whether common law claims are "'based on the same nucleus of facts'" as the misappropriation claims. (*K.C. Multimedia*, at p. 957.) Similarly, *Silvaco* held that an unfair competition law (UCL) claim was not displaced where the "gist" or "gravamen" of the claim did not depend upon a violation of trade secrets law. (*Silvaco, supra*, 184 Cal.App. 4th at 241–242.)

### b. Analysis

In considering whether CUTSA displaces Guild's interference claims, we first note that Guild did not assert a cause of action for misappropriation of trade secrets. But even if a common law claim for the use of confidential information not amounting to a trade secret could be displaced in the absence of a claim asserting a violation of CUTSA, we conclude that the conduct alleged here goes far beyond merely taking and using confidential information. In endeavoring to cast the interference claims as being subject to CUTSA displacement, CCM contends that "[t]he gravamen of [Guild's]

18

claims is . . . the misappropriation of Guild's confidential information." And it refers to Guild's other allegations—e.g., its allegations that CCM induced and conspired with Flowers and his Guild colleagues, *while still employed by Guild*, to destroy the branch by recruiting its personnel to work for CCM, diverting its customers to CCM, and converting its pipeline of active loan applications to CCM—as just a "few stray" "snippets" that Guild has "stitch[ed]" or "cobbled" together to manufacture an appearance at odds with "the core character of" Guild's claims.

But those allegations are not just a few stray snippets. Indeed, far from being tangential, they are the heart of Guild's interference claims. Certainly, the allegations about rummaging about in, and taking confidential information from, Guild's computer systems are pertinent. But the activities described in those allegations may reasonably be said to have been more *in aid* of the prime objective of appropriating the Kirkland branch's personnel, customers, and business pipeline than the prime objective itself. Thus we agree with the view espoused by Guild that "[t]he gravamen of this case is not the misappropriation of trade secrets, but a coordinated scheme between CCM and a Guild branch manager to sabotage a Guild branch office" by "actively working for CCM and competing against Guild while . . . still employed by Guild." Indeed, the scheme allegedly resulted in the loss of Guild's entire Kirkland's branch and most if not all its employees, not merely damages arising from the loss or use of some confidential information and/or trade secrets.

For this reason, we conclude the trial court erred in concluding the interference claims were displaced by CUTSA. (See *Angelica, supra,* 220 Cal.App.4th at p. 508 [holding CUTSA did not displace claim for interference with business relations that had basis independent of any trade

19

secret claim]; *Mattel, Inc. v. MGA Entertainment, Inc.* (C.D.Cal. 2011) 782 F.Supp.2d 911, 994 [holding CUTSA "does not supersede . . . intentional interference with contractual relations []claim to the extent [that the claim] arises out of conduct unrelated to the misappropriation of [claimant's] information"].)

## C.    The Claim Asserting Violation of the CCDAFA

Guild also contends the trial court erred in sustaining CCM's demurrer on the claim for violation of the CCDAFA.  As discussed *ante*, the sole basis on which the demurrer was sustained with respect to this claim was the trial court's conclusion that CUTSA displaced the claim.

### 1.    *The CCDAFA*

The CCDAFA was enacted in 1987, three years after CUTSA.  (Stats. 1979, ch. 858, § 1.)  But it has antecedents dating to 1979—when the Legislature enacted a predecessor statute, codified at Penal Code section 502, that made it a felony (1) to intentionally access any computer system or computer network for the purpose of engaging in specified types of deceitful conduct; or (2) to maliciously access any computer system for any purpose.

Over the next several years, the Legislature expanded the scope of digital information protected, and the scope of conduct punishable, under Penal Code section 502.  (Stats. 1981, ch. 837, § 1; Stats. 1983, ch. 1092, § 292; Stats 1984, ch. 949, § 2.)  This expansion included the enactment in September of 1984—the same month that CUTSA was enacted—of a statute (Stats. 1984, ch. 949, § 2) that reinforced Penal Code section 502 with the addition of a civil remedy, codified at subdivision (h), enabling a person aggrieved by a violation of Penal Code section 502 to sue whoever had been convicted of the violation.

Then in 1987 the Legislature repealed Penal Code section 502 in its entirety and replaced it with a new, more robust and expansive section 502

20

through its enactment of the CCDAFA. (Stats. 1987, ch. 1499, § 3.) The new Penal Code section 502 designated 14 separately enumerated categories of acts as public offenses (some felonies, and others misdemeanors). (Pen. Code § 502, subds. (c) and (d).) Among these offenses are the following types of acts that Guild alleges CCM engaged in:

> "1. Knowingly access[ing] and without permission alter[ing], damag[ing], delet[ing], destroy[ing], or otherwise us[ing] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

> "2. Knowingly access[ing] and without permission tak[ing], cop[ying], or mak[ing] use of any data from a computer, computer system, or computer network, or tak[ing] or cop[ying] any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

> "3. Knowingly and without permission us[ing] or caus[ing] to be used computer services.

> "7. Knowingly and without permission access[ing] or caus[ing] to be accessed any computer, computer system, or computer network."

The new Penal Code section 502 introduced by the CCDAFA also included findings, declarations, and a statement of legislative intent that had not been present in the previous version. Specifically, the Legislature made findings: (1) that "the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data" (Pen. Code § 502, subd. (a)); and (2) that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is *vital* to the protection of the privacy of individuals as well as to the well-being

of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." (*Ibid.*, italics added.)  Spurred by these findings, the Legislature expressed its intent, "in enacting this [new Penal Code] section [502], to *expand* the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems" (*ibid.*, italics added); and it included, at subdivision (e)(1), a civil remedy much like the one that had preexisted it—i.e., a private right of action against persons convicted of violating Penal Code section 502.

But the "expand[ed] . . . degree of protection" that the Legislature had intended the enactment of the CCDAFA to deliver in 1987 evidently turned out to be not expansive enough.  Thus, 13 years later, in 2000, the Legislature *further* expanded the Act's protections by removing the conviction requirement from the civil remedy and making the remedy applicable against *all* persons who violated Penal Code section 502, rather than just against persons who were criminally prosecuted and found guilty.[11]  (Stats. 2000, chs. 634, 635, § 2.)

_____

[11]    The Legislature made this change to Penal Code section 502 by modifying subdivision (e)(1) as follows:

> "In addition to any other civil remedy available, the owner or lessee of the computer system the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator any person convicted under this section . . ."

22

## 2.    *Analysis*

No published California opinion addresses whether CUTSA displaces a civil claim based on the CCDAFA, and federal courts in California are split on the issue.  Some of those federal courts have concluded that CCDAFA claims are displaced by CUTSA whenever claims asserting violations of both statutes are based on the same nucleus of facts.  (See, e.g., *C&H Travel & Tours, Inc. v. Chow* (C.D.Cal., Sept. 26, 2018, No. 2:18-cv-06690-RGK-MRW) 2018 WL 6427369, p. *2; *Henry Schein, Inc. v. Cook* (N.D.Cal., Mar. 1, 2017, No. 16-cv-03166-JST) 2017 WL 783617, p. *2; *Best Label Co. v. Custom Label & Decal, LLC* (N.D.Cal., Apr. 20, 2022, No. 19-cv-03051-SI) 2022 WL 1189884, p. *4.)  Other federal courts have concluded for a variety of reasons that CCDAFA claims are *not* displaced by CUTSA.

Among rationales courts have expressed in arriving at a conclusion that CCDAFA claims are not displaced by CUTSA are:  that CUTSA displacement of CCDAFA claims would be illogical (*Regents of the Univ. of Cal. v. Aisen* (S.D.Cal., Apr. 18, 2016, No. 15-cv-1766-BEN(BLM)) 2016 WL 4097072, p. *8 (*Aisen*) ["it is illogical to think that the California legislature enacted a computer crime provision and deliberately included a civil remedy that would in turn be preempted by other legislation authorizing civil protection for trade secrets"]); that CCDAFA claims are based on the violation of a statute, rather than common law (see, e.g., *JEB Group, Inc. v. San Jose III* (C.D.Cal., Mar. 31, 2020, No. CV 19-04230-CJC(AGRx)) 2020 WL 2790012, p. *4; *Synopsys, Inc. v. Ubiquiti Networks, Inc.* (N.D.Cal. 2018) 313 F.Supp.3d 1056, 1074–1075; *Heieck v. Federal Signal Corp.* (C.D.Cal., Nov. 4, 2019, No. SAVC 18-02118 AG(KESx)) 2019 WL 6873869, pp. *4–5); that CUTSA displacement is limited to information that qualifies as a trade secret and does not apply "to the extent that the misappropriated information was not a trade secret" (*TMX Funding, Inc. v. Impero Techs., Inc.* (N.D.Cal.,

23

June 17, 2010, C 10-00202 JF(PVT)) 2010 WL 2509979, p. *7; accord Trade Secrets Practice in California (Cont. Ed. Bar 2d ed. 2023) § 11.118, p. 11-129 [the CCDAFA "may serve as [a] potent weapon[] for employers and businesses to use against disgruntled employees and other third parties . . . who steal company data, whether or not the information rises to the level of a trade secret"]); and that the CCDAFA is codified in the Penal Code (*Heieck, supra,* 2019 WL 6873869 at pp. *4–5; but see *United Auto Credit Corporation v. Stewart* (C.D.Cal., June 23, 2025, No. 8:25-cv-00065-RGK) 2025 WL 2428466, p. *4.)

Having considered these authorities and the evolution of Penal Code section 502, we are persuaded for each of two independent reasons that CUTSA does not displace civil claims under section 502. First, the social ills that CUTSA targets are quite different from the social ills the CCDAFA targets. Whereas CUTSA is geared toward combatting and remedying predatory conduct directed at certain types of intellectual property, the CCDAFA is geared toward combatting and remedying predatory conduct directed at electronic data and ways in which it can be hosted, stored, and manipulated. This places the private right of action afforded by the CCDAFA within the category of "other civil remedies . . . not based upon misappropriation of a trade secret" (Civ. Code, § 3426.7, subd. (b)(2)) that the CCDAFA, by its terms, "does not affect." (*Ibid*.)

Second, given the fact that the Legislature chose to expand the degree of protection afforded by Penal Code section 502 by enacting a civil enforcement mechanism for it in the very same month (September 1984) in which it enacted CUTSA, we deem it implausible that the Legislature would have intended the civil remedy it added to one statutory framework to be swallowed up to so great an extent by the other statutory framework. (*Aisen,*

24

*supra,* 2016 WL 4097072, p. *8 [describing CUTSA displacement of the section 502 civil right of action as "illogical"].) And it is more implausible still that the Legislature would then have *continued* "to expand the degree of protection afforded" (Pen. Code § 502, subd. (a)) by that civil enforcement mechanism—as it did in 2000, when it eliminated the criminal conviction requirement for a section 502 civil right of action—if it intended that expanded protection to be so extensively displaced.

Thus we conclude that CUTSA does not displace claims pursuant to the CCDAFA, and that the trial court erred in concluding otherwise.

**D.    The Claim Asserting Unfair Competition Pursuant to Business & Professions Code Section 17200 Et Seq.**

Guild's final contention is that  the trial court erred in sustaining CCM's demurrer with respect to the unfair competition claim.  The parties appear to agree, insofar as this appeal is concerned, that the UCL claim rises and falls with the other claims.  Consequently, CCM limits its UCL argument to a contention that:  "Because all of Guild's other claims fail, the judgment of dismissal on Guild's UCL claim should be affirmed."  Having determined that Guild's other claims *do not* fail and that the judgment of dismissal should be reversed as to those claims, we conclude the judgment of dismissal should be reversed as to Guild's UCL claim as well.

### III. DISPOSITION

The judgment is reversed.  Guild is entitled to costs on appeal.


KELETY, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.